M. O. ANDERSON, A. B. C. Packard, Inc., a Washington corporation, Plaintiffs,

v.

GENERAL MOTORS CORPORATION, a Delaware corporation, Defendant.

No. 3966.

United States District Court
W. D. Washington, N. D.
Aug. 28, 1957.

Charles Horowitz, of Preston, Thorgrimson & Horowitz, Seattle, Wash., and Stuart L. Kadison, of Pacht, Ross, Warne & Bernhard, Los Angeles, Cal., for plaintiffs.

J. Paul Coie and William M. Holman, of Holman, Mickelwait, Marion, Black & Perkins, Seattle, Wash., and Henry M. Hogan, Daniel Boone, Detroit, Mich., and Edward J. McGratty, Jr., New York City, for defendants.

RYAN, District Judge.

The defendant at the close of plaintiffs' case, and again at the close of the entire case, moved to dismiss and for a directed verdict upon the grounds then set forth in detail. The Court reserved decision on the motions and now decides them.

The Court, in its consideration, of the motion, must be mindful of the factual contentions of plaintiff, and of the legal principles which would support a judgment in its favor.

We are required to, and without reservation we do, give to the evidence the interpretation most favorable to the plaintiff.

Plaintiffs' claim sounds in tort. It urges a claim arising from a fraud alleged to have been perpetrated upon it by the defendant. Plaintiff has neither alleged nor proved a claim based upon the alleged breach of an enforceable contract.

The fraud which plaintiff alleges is two-pronged. Thus, plaintiff alleges that it was defrauded by defendant by means of affirmative false representations, and that it was also deceived and defrauded by defendant because of defendant's failure to disclose its business policy.

The Court assumes, for purposes of this decision, that such a policy did, in fact, exist.

The misrepresentations, by which plaintiff claims it was defrauded, are alleged to have been made in July, 1947, and on November 9, 1951.

The Court also assumes for purposes of this decision that these statements or representations alleged were, in fact, made as alleged.

The Court has ruled that recovery may be had only on the representation alleged

to have been made on November 9, 1951. The plaintiff has, by absence of proof of damage submitted, limited its recovery by reason of nondisclosure to the period subsequent to January 1, 1947.

It is undisputed that on July 10, 1952, the plaintiff was notified that after June 30, 1953, plaintiffs' distributorship would not be continued. The Court has ruled that after this notification of July 10, 1952, plaintiff may not claim to have continued to have acted in reliance upon the alleged misrepresentation of November 9, 1951, and that it may not claim to have acted after that date because of ignorance of a policy of the defendant, which defendant was required in law to disclose to it.

The Court has ruled that recovery, if any, on the claim, insofar as it is predicated upon non-disclosure is limited to damages which flowed from acts of plaintiff done because of such non-disclosure from January 1, 1947, to July 10, 1952; and the Court has also ruled that recovery, if any, on the claim in so far as it is predicated upon a misrepresentation alleged is limited to damages which flowed from acts of plaintiff done between November 9, 1951, and July 10, 1952.

It is undisputed that between January 1, 1947, and July 10, 1952, five distributors' selling agreements were signed by plaintiff and defendant, and that these agreements were under date of November 1, 1947; November 1, 1948; November 1, 1949; November 1, 1950; and November 1, 1951.

It is also undisputed that following July 10, 1952—the date of the notification of the ending of the distributorship—a last and the final distributors' selling agreement was signed by plaintiff and defendant under date of November 1, 1952.

It also appears undisputed that from 1936 to 1947, a series of twelve distributor selling agreements were signed by the parties.

The first question presented by the motions we are considering, is, what was the legal effect of these several distributor selling agreements upon the claim for which plaintiff seeks recovery.

We observe that this question is to be further narrowed to a consideration of all the agreements only insofar as plaintiff's claim is predicated upon nondisclosure; and of one agreement, that under date of November 1, 1952, in so far as plaintiff's claim is predicated upon the alleged misrepresentation (for that is the only agreement which was signed after November 9, 1951).

It is desirable that we, at this point, examine these distributor selling agreements to see what they provide and to determine later their effect in law upon the plaintiffs' claim.

Each of these agreements provides that there are "no other agreements or understandings, either oral or in writing, between the parties;" that the agreement "cancels and supersedes all previous agreements between the parties;" that the agreement, may not be changed, added to or altered unless "in writing by the General Manager or General Sales Manager" of the Buick Division.

The term provided for in each of these several agreements was one year, but they each also contained a provision that "distributor may terminate this agreement by written notice of termination delivered to seller (Buick Division), such termination to be effective one month after receipt by seller of such notice"; and they each also contained a provision that the seller might, under certain specified conditions, terminate the agreement.

■ Let us consider the plaintiff's claim insofar as it is based upon the contention that it was defrauded because of the failure of the defendant to disclose its policy as it applied to the continuance of plaintiff's distributorship.

We have assumed that such a policy did, in fact, exist. That leaves for decision whether, under the evidence, it may be held as a matter of law that no duty to disclose it lay with the defendant.

Continuously, from 1936 through June, 1953, plaintiff and defendant operated under this series of 18 separate written agreements.

Each one of these specified a definite and certain period during which the agreement was to be effective; not one of them provided for a further extension or right of renewal; nor is there any writing so providing.

The agreements provided at great length the obligations, duties and rights of each of the parties; the agreements did not create a fiduciary relationship; they did not constitute or appoint either one the agent of the other; they were agreements under which plaintiff was granted an option to buy automobiles and parts on stipulated terms and conditions, and the defendant undertook to sell on stipulated terms.

Plaintiff was given the absolute right to terminate the agreement on the giving of a required notice, and the defendant was given a right to terminate, dependent, however, entirely upon the happening of certain events, or the failure of plaintiff to meet and comply with certain of the provisions of the agreement.

The agreements contemplated the operation of the distributorship as a business enterprise, separate and apart from the operation of the defendant's business to the extent that defendant received no share of the plaintiff's profits, undertook to assume or satisfy no losses in plaintiff's business, had no vote in its corporate meetings, had no stock in the plaintiff corporation, and had no representative either as a member of plaintiff's board of directors or as a corporate officer.

There is no evidence that the defendant at any time directed or controlled the means which plaintiff should or did take to comply with the capital requirements of the agreement. The defendant, as the agreement provided it might, did point out to plaintiff wherein plaintiff may have failed, in the defendant's view and opinion, to meet the capital and other requirements and at times insisted upon compliance. It is undisputed by the evidence that the defendant did not at any time direct and order plaintiff to take specific financial steps or to incur definite financial obligations to remedy any particular financial situation of which it complained or of which it took notice.

The compulsive force of these agreements and of the action of the parties under them leads the court to conclude as a matter of law that the relationship between the parties was not such as placed defendant in a position of superiority and influence where it controlled the action and decision of the plaintiff and created a relationship of trust and confidence which impelled the disclosure of any policy which indicated the ultimate and certain discontinuance at an indefinite date in the future of plaintiff's distributorship.

This is especially so when considered in light of the provisions, repeated through the years, which granted plaintiff the right to cease to continue as distributor at any time, for cause upon thirty days notice. No relationship of trust and confidence existed as a matter of law.

The Court will assume arguendo that such a relationship of trust and confidence did, nevertheless, exist.

The agreements lead irresistibly to the conclusion as a matter of law that plaintiff cannot maintain that it took action in ignorance of an undisclosed policy which it would not have taken had the policy been disclosed or known to it. In this consideration, we do not weigh the plaintiff's long years of active experience in the automobile industry, his active participation on trade associations or his wide reading of trade publications. We are, nevertheless, led to these conclusions by reason of the repeated inclusion throughout the years of provisions of time limitation upon the term of the distributorship; by the provisions that the agreements contain and embody all the understandings between the parties; by the provision limiting authority to modify to defendant's two specified of-

ficers; and by the consistently manifested policy of the defendant not to grant agreements for more than one year.

The Court has ruled that there may be no recovery on the alleged misrepresentation of 1947; that it was not actionable; and that, therefore, plaintiff could not act in reliance upon it. Nor do these alleged statements, even if we accept them as made, strengthen plaintiff's position when they are weighed against the pattern of the agreements consistently followed for eleven years prior to the alleged statements and continued for five years thereafter. That the plaintiff may have hoped for the continuance of the renewals is immaterial; that his fondest hope was not fulfilled in the eighteen agreements which were made is questionable; these hopes for the future, in the face of the constant and repeated limitation of one year, and absente of even an alleged actionable representation until November 9, 1951, make it incredible as a matter of law that plaintiff took any action because of ignorance or an undisclosed policy which he would not have taken had that policy been disclosed more than it was by the terms of the agreements.

It is conceded that these provisions of the annual agreements were known to plaintiff, that it understood them and that it was familiar with them. The plaintiff stands bound in law by the terms of these agreements which were made in years which each brought to it substantial net profits, in one year, 1950, totalling $613,755.35 before taxes and bonuses, in another, 1948, $567,730.77 before taxes and bonuses, and a total of such net profits for the period from 1936 through 1952 in excess of $2 million dollars. I conclude that it is incredible as a matter of law that plaintiff took any action because of its ignorance of an undisclosed policy of the defendant.

■ But, let us for a moment turn from our consideration of these agreements insofar as they affect the plaintiff's claim predicated upon nondisclosure and come to consider the claim based upon the alleged misrepresentation.

Recall then that this misrepresentation is alleged to have been made on November 9, 1951; that the plaintiff was advised on July 10, 1952, that the distributorship would not be continued beyond June 30, 1952; that it has been ruled as a matter of law that the plaintiff might not rely after that date upon the prior representation; and that plaintiff subsequently and on November 1, signed the final and last distributor and selling agreement.

The Court rules that as a matter of law the signing of this last agreement of November 1, 1952, operated as a matter of law to deny plaintiff any right to recover by reason of any alleged misrepresentation made on November 9, 1951. This follows as a matter of law since by the notification of July 10, 1952, plaintiff had been advised that its distributorship would be terminated on June 30, 1953, and this notification was a positive, definite and complete repudiation of the representation alleged to have been made on November 9, 1951, and the agreement of November 1, 1952, was signed with full knowledge of this repudiation and disavowel of the prior alleged representation.

■ But, plaintiff also contends that the various distributor selling agreements were involuntarily executed and were voidable at its option because they were signed by it under conditons of "business compulsion" or of "economic duress".

We will assume arguendo that the doctrine of economic duress, or of business compulsion, may be applied to the situation here presented and this notwithstanding the fact that the plaintiff has, but by the execution of the agreements, either surrendered a contractual right or has been compelled to make a payment of money it was not contractually or legally obligated to make. The undisputed facts show that the plaintiff corporation was never insolvent or hard pressed for funds at any time after 1947

up to the time of the termination of the distributorship; that plaintiff was able to pay for every car ever shipped to it when shipped; that it was never behind in its accounts; that it had a very fine credit standing with the banks and with all the people with whom it did business; and that it made substantial net profits throughout the years under these undisputed facts and with a net worth of $959,524.95 on December 31, 1951, and a net worth of $1,023,718.05 on December 31, 1952, in a business which commenced business in 1936 with a capital investment of $7,500 and a history of consistent profitable operations. It cannot be said that any of the agreements signed during the intervening years were signed in the context of business compulsion, no matter how liberally that doctrine of law might be expanded or applied.

Nor may it be urged that the final agreement of November 1, 1952, was an involuntary act under the so-called Washington Smelt case. [Smelt Fishermen's Ass'n v. Soleim, 39 Wash.2d 524, 236 P.2d 1057.] That suit did not involve the application of the doctrine of business compulsion. It was held there that the doctrine did not apply to the situation presented, but it did present the question of whether, as a matter of law, the payment of a sum in excess of what was in fact contractually owed for goods sold and delivered might thereafter be recovered, or whether such payment precluded as a matter of law the right to sue to recover the excess amount of the payment so made. It was held that under the factual circumstances present there was no waiver as a matter in law to the right of suit so to recover the payment in excess of the contractual operation. This decision recognizes and applies a principal of law almost universally enforced. It is not applicable to the facts of this suit. It must be held as a matter of law that the agreements were freely and voluntarily signed and that all elements of "business compulsion" were absent under the evidence presented as a matter of law.

At the time of the signing by plaintiff of the last agreement of November 1, 1952, plaintiff knew and was advised that any representation as to a continuance of its distributorship was repudiated and disavowed and that its distributorship was to terminate and end on June 30, 1953. It freely and voluntarily signed the agreement of November 1, 1952, with this knowledge. It did not act in any ignorance. It was advised fully of the situation which confronted it. It knew exactly what it was signing and was familiar with the terms and provisions of the agreement. The signing by plaintiff of this agreement was its well-considered and freely executed act. Plaintiff may not now in justice complain if this free and voluntary act is held to a complete and absolute waiver of any alleged right it may have had and an intentional and voluntary relinquishment of all claims against the defendant except those saved in the agreement.

The motion to dismiss and for a directed verdict is granted and the plaintiff is dismissed with the costs to the defendant.