Victor J. CHMIELESKI and Geraldine C. Chmieleski, Respondents,

v.

CITY PRODUCTS CORPORATION, Appellant.

No. WD 32660.

Missouri Court of Appeals, Western District.

Sept. 20, 1983.

Motion For Rehearing and/or Transfer to Supreme Court Overruled and Denied Nov. 15, 1983.

Application to Transfer Denied Dec. 20, 1983.

Donald W. Giffin, Frank B.W. McCollum, Curtis E. Woods, & William C. Martucci of Spencer, Fane, Britt & Browne, Kansas City, for appellant.

John T. Martin, John C. Monica, & Laura D. Stith of Shook, Hardy & Bacon, Kansas City, for respondents.

Before LOWENSTEIN, P.J., and WASSERSTROM and MANFORD, JJ.

MANFORD, Judge.

This is a civil action presented upon a third amended petition containing five counts. Count I was for damages resulting from an alleged conspiracy to breach a lease. Count II sought recovery of capital and labor investment allegedly lost as a result of the refusal to renew a franchise agreement. Count II was abandoned prior to trial. Count III sought damages resulting from an alleged breach of a fiduciary duty. Count IV sought damages resulting from an alleged breach of a written franchise agreement. Count V sought damages for alleged fraud. Count V was dismissed voluntarily at the close of the plaintiffs' evidence. The case was submitted to the jury upon the remaining Counts I, III, and IV. The jury returned a general verdict assessing $224,000 in actual damages and $945,800 in punitive damages, for a verdict total of $1,169,800. Judgment was entered in accordance with the verdict. This appeal followed the overruling of timely filed after-trial motions. The judgment is in part reversed as to Count I and Count III, and the remainder of the judgment is reversed as to Count IV, but the cause is remanded with instructions as to Count IV, the breach of contract claim.

The development of this litigation has produced some 5,000 pages of transcript, several hundred supporting exhibits, some 41 pretrial motions and motions in limine, and 39 points of alleged error on this appeal. Such volume prohibits a minute account of the facts. What follows is a factual summary to provide the reader with an overview of the matter. Any additional applicable facts are considered within the disposition of the points relied on.

Before proceeding further and for purposes of clarity, the parties are identified. Appellant (hereinafter referred to as City Products) was an original co-defendant at trial. The President of the Dannen Corporation of St. Joseph, Missouri (hereinafter referred to as Dannen) was called as a witness for the respondents pursuant to a settlement agreement entered into previously between Dannen and the respondents. Respondents (hereinafter referred to as the Chmieleskis) were original plaintiffs at trial.

The record discloses that the Chmieleskis took up residence in Chillicothe, Missouri in 1956. At this time, Mr. Chmieleski was an employee of Butler Brothers Company as a manager of a Scott Variety Store in downtown Chillicothe. At this point, Mr. Chmieleski had some ten years in the variety store business. City Products purchased Butler Brothers and in 1960, the Chmieleskis purchased the Scott store. The Scott store was renamed Ben Franklin. The purchase by the Chmieleskis was pursuant to a franchise agreement with City Products. The Scott, turned Ben Franklin, store was operated by the Chmieleskis in downtown Chillicothe from January, 1961 to January, 1966. The franchise agreement relative to the downtown Ben Franklin store had an expiration date of December 31, 1965. Until November, 1965, the Chillicothe area had only one additional variety store, that being a Woolworth store next door to the Ben Franklin owned and operated by the Chmieleskis. In November, 1965, a Mattingly's store opened about one mile from the Ben Franklin. The Chmieleskis experienced a decline in sales as a result of the Mattingly store.

The landlord and owner of the building containing the Chmieleskis' downtown store was Louis Stein. The record reveals that City Products was unsuccessful in renewing the downtown store lease. Stein testified

at trial that he would not or did not intend to renew the lease with City Products. By their own testimony and documentary evidence, the Chmieleskis contended that City Products deliberately did not renew the lease with Stein. The expiration date of the downtown lease was August, 1966.

City Products commenced a search for another store location. This search brought City Products and Dannen together. Dannen was developing a "strip" shopping center on U.S. 65 Highway in Chillicothe. This center was named the Southtown Shopping Center.

During lease negotiations, Dannen advised City Products that it (Dannen) was close to leasing space to a Green Hills grocery store, a Coast to Coast store and a Sears catalog outlet. During the course of this litigation, these three stores became known as the "dominant stores." The role of these stores is discussed in more detail infra.

Lease negotiations continued between City Products and Dannen, which culminated in the execution of a lease. During trial, this lease became known or referred to as the "underlying lease." The "underlying lease" became and remains a focal point in this litigation, so it is advisable at this point to set forth two specific sections of that lease. In addition to the general terms wherein City Products was to lease some 4,000 square feet for the Ben Franklin store for an annual rental of $4,740 in equal monthly installments plus an additional rental based upon a percentage of gross sales above $102,000, the "underlying lease" provided:

"2.10 That the Landlord will not, during the term of this Lease or any extension or renewal thereof, lease, use, or permit to be used, (a) any portion of the building in which the leased premises are located, or (b) any part of that piece of land the complete legal description of which is set forth in said Lease, or (c) any other building or premises which the Landlord owns, controls, or in which he has any beneficial interest, and which is located within one (1) mile of any boundary of that piece of land referred to in (b) above, for any business similar to, or in substantial competition with, the business of the Tenant in the leased premises.

Businesses similar to that of the Tenant shall include, but not be limited to, (1) variety stores including, but not limited to, all stores owned or operated by F.W. Woolworth Co., S.S. Kresge Co., W.T. Grant Co., Neisner Brothers, Inc., J.J. Newberry Co., G.C. Murphy Co., McCrory Corp., and _____; and (2) variety drug stores occupying more than 5,000 square feet.

Businesses in substantial competition with the Tenant shall include, but not be limited to, (1) all those which devote thirty (30%) per cent or more of their sales area to items of merchandise which are identical to, substantially the same as, or which, for practical purposes, perform the same function as, those offered for sale by the Tenant; or (2) any toy, hobby, or discount store containing, respectively, sales areas in excess of _____ square feet.

It is expressly covenanted and agreed that the covenants contained in this Section 2.10 are material covenants and, in the event any of them are breached, and said breach continues for thirty (30) days after written notice to the Landlord, the Tenant may, in addition to the other remedies under this Lease, pay as rent, in lieu of any other rent hereunder, an amount equal to four (4%) per cent of its gross sales, said rent to be paid monthly on or before thirty (30) days after the expiration of the month for which the same is due and to continue until the breach is cured or until this Lease is terminated, by lapse of time or otherwise."

"3.02 That all of the following stores (herein sometimes referred to as "Dominant Stores") Green Hills Super Market 10,000 sq. ft.; Sears Order Office 5,040 sq. ft.; Coast to Coast 4,000 sq. ft. and all of the other retail stores and service establishments shown on said Plan, or satisfactory substitutes therefor, shall be open for business with the public during the

entire term hereof and any extension or renewal thereof. The Landlord further represents and warrants that good and valid leases covering all of said Dominant Stores have been executed and delivered, said leases having terms beginning no later than the beginning of, and ending no sooner than the end of, the term of this Lease. A satisfactory substitute for any such Dominant Store is hereby defined to be a store of the same classification, open for business with the public, selling the same type of goods, wares and merchandise as, located at the same place as, and having a sales area no smaller than, the store it is replacing. A satisfactory substitute for any other retail store shown in said Plan is hereby defined to be a retail store, open for business with the public, having a sales area no smaller than that of the store it is replacing, and not of a type substantially the same as or in substantial competition with the Tenant's store, within the definition of Section 2.10 above. A satisfactory substitute for any service establishment shown on said Plan is hereby defined to be a service establishment, open for business with the public, having a service area no smaller than the establishment it is replacing."

Section 2.10 has and continues to be referred to as the "Protection Clause". Section 3.02 has and continues to be referred to as the Dominant Store Clause".

Nearly five months after the execution of the "underlying lease", City Products and the Chmieleskis entered into a sublease. The sublease was executed on August 23, 1965, and on this same date, City Products and the Chmieleskis executed a franchise agreement relative to the operation of a Ben Franklin store at the Southtown Shopping Center.

Dannen encountered difficulty in securing leases from two of the "dominant stores", Sears and Coast to Coast. This difficulty was expressed to City Products. By their evidence, City Products contended that Dannen, during lease negotiations, assured City Products that leases from all three dominant stores had been signed.

The Chmieleskis, by their evidence, contended that representatives of City Products represented to them that leases from the "dominant stores" had been executed. The record reveals that Dannen, during negotiations and after the Ben Franklin store opened, did not have signed leases from Sears and Coast to Coast. The record reveals that Sears did open a store long after Ben Franklin had opened.

The sublease between City Products and the Chmieleskis provided for the same rental terms as found in the "underlying lease". The sublease contained neither a "protection clause", nor a "dominant store clause". The sublease contained an effective date of November 1, 1965, but the Chmieleskis did not open the Southtown store until February 24, 1966. The Chmieleskis meanwhile continued to operate the downtown store as a non-Ben Franklin store between January 1, 1966 and August 31, 1966 to liquidate inventory at the downtown store. They operated the downtown store as a non Ben Franklin enterprise because of the expiration of the franchise agreement (effective December 31, 1965) relative to the downtown store. The record reveals that City Products reimbursed the Chmieleskis for one-half the lease costs on the downtown location from January, 1966 to August, 1966.

When the Chmieleskis opened their Southtown store on February 24, 1966, only one of the three specified "dominant stores" was opened in the shopping center. This store was the Green Hills grocery. Because the two remaining "dominant stores" were not in the center, City Products elected to pay a flat 4% of gross sales of the Ben Franklin store as rental pursuant to § 3.01 of the "underlying lease". Section 3.01 provided one additional alternative—full cancellation of the lease. The 4% rate was passed on to the Chmieleskis, although the sublease contained no such requirement.

On November 22, 1966, a Gibson store opened in the shopping center. Since the Gibson store is at the very center of the dispute between the parties, a more detailed discussion of the facts surrounding

this store is undertaken infra. The evidence further revealed that shortly following the opening of the Gibson store, another variety store (The Place) opened at the former downtown Chmieleski location.

The evidence revealed that during the ensuing months, the Chmieleski store experienced declining sales. The evidence surrounding this decline is, of course, highly controverted between the parties, and more details of the applicable facts are to be observed infra. It suffices to state at this point that the Chmieleskis continued to operate the Ben Franklin store until the expiration of the franchise agreement (December 31, 1971). Between this expiration date and April, 1974, the Chmieleskis operated an independent variety store named Vic's Variety Store. The Chmieleskis continued to occupy the premises at the southtown location pursuant to the terms of the sublease. The "sublease", under the original written terms, was to expire on January 31, 1976.

Dannen made demand for possession of the premises. Two suits were filed by Dannen. The first suit was dismissed. In the second suit, the Chmieleskis filed a counterclaim against Dannen. That suit ended in a compromise settlement between Dannen and the Chmieleskis by which Dannen paid to the Chmieleskis the sum of $72,000, and further agreed, if subpoenaed, to appear in any litigation by the Chmieleskis against City Products. The Chmieleskis relinquished possession of the premises.

The present action was filed against City Products by the Chmieleskis on January 28, 1975. A six-weeks trial followed months of discovery proceedings. This appeal followed the entry of judgment upon the jury's verdict.

Under its point (1), City Products subdivides its charged error into no less than six points. It is charged by City Products that the trial court erred in entering judgment on respondents' claim of conspiracy to breach the lease because:

(a) respondents failed to state a claim upon which relief could be granted because they were neither parties to the lease nor third party beneficiaries to the lease;

(b) no claim lies as a matter of law for a conspiracy between a promisor and promisee to "breach" a contract;

(c) the conspiracy, if any, occurred more than five years before this suit was commenced and thus the claim was barred by § 516.100/516.120, RSMo 1978, the statute of limitations;

(d) the verdict-directing instruction was erroneous in that it failed to require the jury to find that appellant conspired for the purpose of inflicting harm on respondents;

(e) the verdict-directing instruction failed to require the jury to find that appellant caused or induced a breach of the lease or that had it not been for appellant's acts, the breach would not have been committed by Dannen; and

(f) there was no clear and convincing evidence of a conspiracy between appellant and Dannen to breach the lease.

Disposition of this first point does not take up or discuss (d) and (e) above and it suffices to state that appellant's contention that the verdict-directing instruction was defective is correct, which in and of itself would have mandated reversal of this judgment.

Attention is directed to the remainder of the subpoints. They are so interrelated that they are taken up and disposed of conjunctively.

Throughout these proceedings, the Chmieleskis have contended that City Products and Dannen conspired between themselves to breach § 2.10 of the "underlying lease" (protection clause) and § 3.02 of the "underlying lease" (dominant store clause). Paraphrased, these sections of the underlying lease provide that: (1) Dannen would not lease *more than* 5,000 square feet of space to a "discount" type store, and (2) that at the time the Chmieleskis' store opened at the Southtown location and during the length of the lease, certain "dominant stores", to wit, Green Hills Grocery,

Sears, and Coast to Coast, would be open for business.

In support of their claim, the Chmieleskis contend that they were third party beneficiaries to the "underlying lease" by virtue of the sublease. They further point out the evidence denotes that both City Products and Dannen intended the "protection clause" and the "dominant store clause" to benefit them (the Chmieleskis).

At this juncture, it is necessary to reference the factual background upon the record which explains what occurred subsequent to the execution of both the "underlying lease" and the sublease relative to the entry of the Gibson store and the failure of Dannen to provide the other two "dominant stores".

The record shows that Dannen was encountering difficulty in securing both the Sears store and the Coast to Coast store as tenants. City Products testified that Dannen had stated (during lease negotiations) that the leases on all three dominant stores were signed. In September, 1965, Dannen inquired of City Products relative to the latter's willingness to substitute other stores for the Sears and Coast to Coast Stores. There is no evidence to show that at this point in time, City Products knew or had reason to know that Dannen did not have signed leases from Sears and Coast to Coast. The Chmieleskis opened their Ben Franklin store on February 24, 1966, and it was evident to everyone that Sears and Coast to Coast were not in the shopping center. The Green Hills Grocery was open and operating. Because Coast to Coast and Sears were not open, City Products, under § 3.01 of the "underlying lease", exercised its option to pay a flat 4% of gross sales from Ben Franklin to Dannen as rental. The sublease between City Products and the Chmieleskis contained no rental adjustment, but City Products reduced the rental to the Chmieleskis to the 4% of gross sales.

Approximately one month after the Chmieleskis opened their store, a Hills Brothers Shoe Store opened next door and in the location originally designated for the Coast to Coast store. The Chmieleskis experienced poor sales which they attributed to the lack of customer traffic. The problem of declining sales continued, along with the absence of both Sears and Coast to Coast until September, 1966. On September 13, 1966, Dannen (by letter) contacted City Products wherein Dannen expressed its feeling that a Gibson Discount Store would be good for the shopping center and for Ben Franklin, as its presence would create more customer traffic. In this same letter, Dannen admitted that § 2.10 of the "underlying lease" prevented it (Dannen) from leasing *more than 5,000 square feet* to any discount store. The consideration by Dannen of the Gibson store contemplated the use of 8,500 square feet by Gibson. In the same letter, Dannen asked City Products to agree to a modification of § 2.10 of the "underlying lease" to permit Gibson to use 8,500 square feet. Coupled with the requested modification was an offer by Dannen to reduce the annual rental to 3½% of gross sales from Ben Franklin during the remainder of the terms of the "underlying lease".

Following the receipt of the above letter, a representative of City Products contacted the Chmieleskis regarding the proposed change. Nothing within the terms of the sublease or the franchise agreement between City Products and the Chmieleskis required approval by the Chmieleskis. The record discloses that a conference between City Products and the Chmieleskis occurred. During this conference, Mr. Chmieleski claimed that he had never heard of Gibson, nor was he familiar with the operation of such a store. The representative of City Products related to the Chmieleskis that he was generally familiar with Gibsons, that it was a "sloppy operation", that it did not carry comparable lines of merchandise, or have basic departments or merchandise lines as did Ben Franklin, and in general, he did not think that Gibson would provide serious competition for Ben Franklin. At this point, the City Products representative also told the Chmieleskis that the Gibson store was just being suggested or discussed. He also told them that City Products was

taking "a vote" as to whether to explore the possibility of a Gibson store. He assured the Chmieleskis that he would get back to them. The Chmieleskis contended that they received no further word about the matter. The evidence does reveal that Mr. Chmieleski declared in writing to City Products (relative to the Gibson entry), "This is agreeable with us."

By way of a letter dated September 29, 1966 from Dannen's counsel, City Products was again contacted. In summary, the letter acknowledged City Products' request for the reinstatement of the assignment clause in the "underlying lease". The underlying lease never contained an assignment clause to permit City Products to assign the lease. The letter went on to state:

"In line with our telephone conversation earlier today, I would suggest that any supplemental agreement drafted reinstating the assignment clause of the original lease, paragraph 2.11, should also contain an amendment which makes it perfectly clear that Gibson Products Co., is excepted from the protection clause 2.10 of the lease. Dwight's earlier suggestion that this be accomplished by including the square feet applicable to discount stores from 5,000 to 8,500 feet makes it perfectly clear that a discount store in excess of 8,500 square feet would be in substantial competition with Ben Franklin. I would prefer that this be covered by adding an additional sentence to the end of the first sub-paragraph of the protection clause, paragraph 2.10, in the following language:

"Notwithstanding the foregoing, tenant does consent to the lease of an area not in excess of 8,500 square feet to Gibson Products Co., for use as a discount store."

It is my understanding that Dwight had already consented, for and in consideration for the waiver of protection as to Gibson Products Co., that the rent would be reduced to a straight 3½ per cent of the gross sales. It would seem to be implicit in such an arrangement that paragraph 3.02 "Other tenants in Shopping Center", be amended by deleting Sears Order Office and Coast to Coast Stores, in order to make it clear that the landlord will not continue to be in default under paragraph 2.14. It would seem to me that, if this is not done, strictly under the terms of the lease the landlord might be deemed to continue in default notwithstanding the fact Gibson Products Co., had been supplied as a tenant in lieu of Sears Order Office and Coast.

I believe the reinstatement of the assignment clause will be acceptable to Mr. Dannen; however, we will try to have this submitted to him at the earliest possible date."

The evidence further reveals that before City Products responded to the September 29, 1966 letter, Dannen executed a lease with Gibson under a date of October 1, 1966. Neither the Chmieleskis nor City Products had opportunity to review the Dannen-Gibson lease prior to its execution.

On October 3, 1966, a representative of City Products wrote counsel for Dannen. That letter stated:

"We have your letter of September 29 regarding the Gibson Products lease in Chillicothe and modification of our present lease.

Your reference to 2.10 and the additional language appears satisfactory.

However, your comments on paragraph 3.02 should be changed to substitute Gibson and Hill Brothers shoe store for Sears and Coast to Coast. Would this be acceptable?

As soon as you have had the opportunity to review the assignment clause with Mr. Dannen, let me know so that we can have the papers processed."

There is no evidence that Dannen responded to the City Products letter of October 3, 1966. The record shows that City Products never accepted the reduced 3½% rental. The assignment clause was never reinserted in the "underlying lease". On November 7, 1966, City Products, by letter, contacted Dannen to "be brought up to date". This inquiry went unanswered and was followed by the November 16, 1966

opening of the Gibson store. There is no evidence that either City Products or the Chmieleskis knew of the Gibson opening or the execution of the lease between Gibson and Dannen prior to the opening of the Gibson store.

Dwight Dannen, president of Dannen, was called as a witness by and for the Chmieleskis, and his testimony was in support of their case in chief. He stated that the "protection clause" (§ 2.10) was never amended, nor did City Products ever agree to the amendment of that section. Dannen was asked if there was ever any "secret deal with Ben Franklin to break your (Dannen's) promises herein § 2.10 which is the protection clause." Dannen responded:

"That's ridiculous, Mr. McCollum. We wouldn't have done such a thing, and it's ridiculous to think that a big company like City Products would make any kind of a deal with a little company like ours. There's no reward for them to do that. It's not conceivable. We made no kind of an agreement with them except at the beginning of the lease period. We let Gibson come into that shopping center because Ben Franklin had an option in the lease if we did it. They had two options. They could cancel the lease or they could go on the percentage rent basis, and they elected to go to the percentage rent basis. We made no kind of deal with them at all, simply what's written in that agreement."

Dannen was then asked about his statement via an interrogatory where he had answered that City Products had consented to the modification. Dannen responded: "If I remember right, Mr. McCollum, our attorneys even filed a correction to that because there were never any consents or agreements between us and City Products."

The Chmieleskis contend that other evidence disproves Dannen's claim of no agreement between Dannen and City Products to amend § 2.10. The first item is a letter dated September 13, 1966 from Dannen to City Products (mentioned above). That letter reads:

"As I mentioned to you on the telephone, we have a good chance of getting a Gibson Products Company store in the Southtown Shopping Center at Chillicothe. They would take the 8,000 ft. empty store space on the north side of the center. We recognize that the protection clause of your lease restricts us from leasing to a discount store of more than 5,000 ft., but since we feel that this Gibson store would be a good thing for the center, for the Dannen Corporation, and even for Ben Franklin in that it would create a great deal more traffic at the center, we request your permission to amend that clause to the prohibition on discount store at 8,500 ft.

In order to make it attractive to you to thus amend the lease, we would be willing to make your rent run a straight 3½% of gross sales through the period of the lease.

Thank you for your consideration of this matter."

In further support of their claim, the Chmieleskis refer this court to the September 29, 1966 letter set forth above. It is not necessary to restate that letter, as it is set forth verbatim above. Continuing, the Chmieleskis point to a letter from City Products to Dannen dated October 3, 1966. That letter reads as follows:

"We have your letter of September 29 regarding the Gibson Products lease in Chillicothe and modification of our present lease.

Your reference to 2.10 and the additional language appears satisfactory.

However, your comments on paragraph 3.02 should be changed to substitute Gibson and Hill Brothers shoe store for Sears and Coast to Coast. Would this be acceptable?

As soon as you have had the opportunity to review the assignment clause with Mr. Dannen, let me know so that we can have the papers processed."

In addition, the Chmieleskis reference Dannen's answers to interrogatories given in another lawsuit. Those answers (and the questions to those answers) read:

(d) Describe the exact nature of the agreement or understanding between the plaintiff and City Products Corporation with regard to the Gibson Discount Store and the amount of rent to be paid to the plaintiff.

ANSWER: By telephone and correspondence to the persons indicated in the foregoing responses to Interrogatory 7(a) and (b) and in meetings at the Dannen office and in meetings at the office of City Products Co. in Kansas City, Missouri, at which time Paul Curley and Dwight L. Dannen were present early in the month of September, 1966, and early during the month of October, 1966. It was understood and agreed that Gibson Products Co. would draw traffic to the shopping center and would not be adverse to the interests of the Ben Franklin Store; that the area of the Gibson store would not exceed 8,500 feet; that Gibson Products Co. was accepted in lieu of Sears' order office and Coast-to-Coast; and that the rental would be reduced to 4% of the gross sales.

(e) Attach copies of any documents concerning or discussing any "consent" or "election" to which you refer in answer to any of the foregoing interrogatories.

ANSWER: The only formal document is copy of letter dated September 29, 1966 from David H. Morton to Mr. Paul Curley, copy of which is attached. All other consents or elections have been by course of conduct in paying rent and in telephone conversations mentioned in answer to Interrogatory 7(a)."

The Chmieleskis add to the foregoing a letter executed by Dannen to City Products under date of May 19, 1970. This letter was a demand to surrender the Ben Franklin premises to Dannen. The pertinent portion which the Chmieleskis claim is further evidence of the conspiracy between City Products and Dannen to breach the lease (§ 2.10) reads as follows:

"Soon after the opening of the shopping center, Gibson's desired to rent space, and after much correspondence, you suggested for the time being the Lessor was *safe*

in going ahead and you would remit on the basis of 4% of gross receipts."

The author of the letter was never called to explain the above letter.

On this point, Dwight Dannen, called as a witness for and by the Chmieleskis, testified as follows on the point raised by the letter:

"Q. Now, I'm going to ask you if indeed there were not correspondence and communications from City Products indicating to Dannen Corporation that it was okay or safe as far as Dannen Corporation was concerned for Gibson's to be—go ahead and go into the shopping center?
A. I think there's a letter from David Morton to City Products saying—using the word safe. I don't think City Products ever told us it was safe to go ahead.
Q. But they say it was okay?
A. I don't think they ever said it was okay. In fact some of the documents you've presented indicate that they never considered it was okay. When we tried to get them to go on a base rent like they were supposed to do they used that as an excuse for not doing that."

In disposition of point (1), this court considers only two subpoints thereunder. The remainder of the charged errors are neither reached nor discussed. Disposition gives rise to and requires the answering of two questions. These are: (a) Were the Chmieleskis third party beneficiaries to the "underlying lease"? (b) Was there clear and convincing evidence of a conspiracy to breach the "underlying lease" between City Products and Dannen?

For the Chmieleskis to prevail upon a claim of civil conspiracy to breach the "underlying lease", it was necessary for them to prove that they were third party beneficiaries. It is evident from the "underlying lease" itself that the Chmieleskis were not parties to that lease agreement. The Chmieleskis do not even claim such a status. It becomes necessary then to determine if they were third party beneficiaries.

The rationale of a claim for civil conspiracy lies in the fact that the "gist of

the action is not the conspiracy, but the wrong done by acts in furtherance of the conspiracy." *Mills v. Murray,* 472 S.W.2d 6, 12 (Mo.App.1971), or stated further, "Strictly speaking, the fact of conspiracy is not actionable, there is no distinct writ of conspiracy, but the action sounds in tort and is in the nature of an action on the case upon the wrong done under the conspiracy alleged." *Mills, supra,* at 12. Stated another way, if no action on the case lies, no cause of action for conspiracy may be maintained. *Darrow v. Briggs,* 261 Mo. 244, 169 S.W. 118 (1914).

Under our law, a third party beneficiary contract is such a contract "in which the promisor engages to the promisee to render some performance to a third person." *Slate v. Boone County Abstract Co.,* 432 S.W.2d 305, 307 (Mo.1968). This rule has been further explained in the case of *Stephens v. Great Southern Savings & Loan Association,* 421 S.W.2d 332, 335 (Mo.App.1967), wherein the court declared:

"It has long been settled in this jurisdiction that 'when one person, for a valuable consideration, engages with another by simple contract to do some act for the benefit of a third, the latter, who would enjoy the benefit, may maintain an action for the breach of such engagement.' But this general rule is subject to various qualifications and limitations. 17A C.J.S. Contracts § 519(4)a, p. 961. So ' "[i]t is not every promise . . . made by one to another from the performance of which a benefit may ensue to a third, which gives a right of action to such third person, he being neither privy to the contract nor to the consideration. The contract must be made for his benefit as its object, and he must be the party intended to be benefited." ' And the intent necessary to establish the status of a third-party beneficiary is 'not so much a desire or purpose to confer a benefit on the third person, or to advance his interests or promote his welfare, but rather an intent that the promisor assume a direct obligation to him.' 17A C.J.S. Contracts § 519(4)c, l.c. 975."

It is noted that our courts have not limited the determination of the question of third party beneficiaries to the promisor alone, but rather, the intent of both parties is considered. *Laclede Investment Corp. v. Kaiser,* 596 S.W.2d 36, 41 (Mo.App.1980).

It is against the foregoing principles that the evidence in the instant case must be weighed to answer the first (a) question. It is, of course, the position of the Chmieleskis that they were third party beneficiaries, and thus, entitled to sue for a breach of the "protection clause" and the "dominant store clause" upon the conspiracy between Dannen and City Products. Obviously, City Products presents a contrary contention.

It is elementary to state that the status of the parties, i.e., promisor, promisee, and/or third party beneficiary arose and became fixed at the moment the "underlying lease" was executed. Thus, if the Chmieleskis were third party beneficiaries, their status as such originated and became fixed on March 17, 1965. The record discloses that the "underlying lease" was executed on March 17, 1965 and by virtue thereof, Dannen's position was established as the promisor and City Products' position was established as promisee.

The Chmieleskis called Dwight Dannen as their witness, and inquiry was made of Dannen about the status of the Chmieleskis. The record which follows depicts Dannen's understanding of the status of the Chmieleskis.

"Q. Mr. Curley said to you, 'Well, Mr. Dannen, we have subleased those premises out there to Mr. and Mrs. Chmieleski'?

A. No, Sir, Mr. Curley didn't say that.

Q. Mr. Curley didn't say that?

A. Not the way I remember it.

Q. Mr. Curley did tell you, though, that he would see if he could get some people out there to see if they could get the sales increased?

A. Mr. McCollum, we understood that Chmieleski was managing this store for Ben Franklin. I must confess that I was new in the business, probably naive and didn't know as much about it as I should have, but I had been warned by friends

from the business not to let an independent operator lease a building from us and be sure that the parent company leased it, and when the parent company leased this we had thought it was their store and that Mr. Chmieleski was a manager, and we suggested, as I remember, that Ben Franklin do something to make their manager more productive at that store."

Obviously, City Products argues that the foregoing testimony by a witness for the Chmieleskis depicts that this witness observed Mr. Chmieleski as an employee of City Products and hence evidenced no intent that the Chmieleskis were to benefit from his promises within the "underlying lease" and more particularly, the "protection clause" and the "dominant store clause".

In contrast, the Chmieleskis contend that further evidence establishes that Dannen in fact knew that the Chmieleskis would occupy the premises. The Chmieleskis point to their introduction into evidence of an interrogatory over objection of City Products, discussed infra.

In addition, the Chmieleskis point to a statement by City Products' counsel during its opening statement that declared, "Well, we (City Products) don't run stores. Ben Franklin doesn't operate them. We need somebody to operate them." The Chmieleskis further point out that the "underlying lease" authorized City Products to sublease the premises under § 2.11 of the "underlying lease". The Chmieleskis then argue that the "underlying lease" permitted assignment of the lease by City Products.

The foregoing is the sum total of the evidence upon the question, and requires analysis. The Dannen testimony speaks for itself and needs no further discussion, except to conclude that as a witness for the Chmieleskis, Dannen stated he understood that Mr. Chmieleski was an employee (store manager) of City Products. This understanding by Dannen dispels the idea that Dannen viewed the Chmieleskis as independent parties, and further dispels the notion that Dannen intended the Chmieleskis to

benefit from Dannen's promises within the "underlying lease" and particularly, the "protection clause" and the "dominant store clause". The Chmieleskis were bound by that testimony.

As regards the interrogatory evidence, the pertinent portion of the interrogatory reads as follows:

"MR. MARTIN: This is interrogatory number 26. 'Did City Products notify the Dannen Corporation at or before the time it entered into the said lease agreement that it intended to sublease the subject store premises to a Ben Franklin franchisee?' 'Answer: Yes. At the commencement of the discussions between the Dannen Corporation and City Products concerning the Southtown premises in 1964 P.L. Curley, Marketing and Real Estate Manager, Kansas City Region, Ben Franklin, advised Dwight Dannen, President Dannen Corporation and Ken Johnson leasing agent, the Dannen Corporation, that plaintiffs would occupy the Southtown premises.'"

From the above interrogatory, the Chmieleskis conclude that Dannen knew they would occupy the premises, and therefore intended the "underlying lease", particularly the "protection clause" and the "dominant store clause", to benefit the Chmieleskis.

The record reveals that the above interrogatory was read into the record, over the objection of City Products that it contained hearsay, subsequent to the testimony of Dwight Dannen. The record does not disclose use of the interrogatory by either party during the testimony of Dannen. In addition, this court has been unable to identify the source of this interrogatory. The foregoing aside, the interrogatory merely expresses an understanding by Dannen that the Chmieleskis would occupy the premises. There is nothing further within the answer to this interrogatory which acknowledges that Dannen knew the Chmieleskis were franchisees, or owners, or the designated subtenants of the premises.

As noted above, it is the contention of the Chmieleskis that further proof of their capacity as third party beneficiaries was established by the statement by City Products that, "Well, we don't run stores. Ben Franklin doesn't operate them. We need somebody to operate them." This quoted statement arose during the opening statement of counsel for City Products. The Chmieleskis, in their brief, suggest to this court that the above statement was part of the evidence. The quoted statement, as noted, arose during the opening statement, and as noted below, was included with additional evidentiary reference. The record does not reveal any evidence to support the statement. The entirety of the paragraph reads as follows:

> "Now, the evidence will show that City Products or Ben Franklin had a sublease with Mr. and Mrs. Chmieleski. We went out and said, 'Okay, Dannen, we'll agree to this lease. We'll—and of course Dannen can pick the lease—down and maybe get his mortgage company to loan him some money, I don't know, and then we turn around and say, 'Well, we don't run stores. Ben Franklin doesn't operate them. We need somebody to operate them.'"

The foregoing does not describe or identify the Chmieleskis. The statement does not even describe the status of the person to operate the Ben Franklin store. The statement could just as reasonably denote an employee, as it could denote a franchisee or subtenant owner lessee.

The Chmieleskis turn attention to the "underlying lease" which authorized City Products to sublet. From this, they conclude that this was further proof that Dannen knew, and thus, intended the Chmieleskis to benefit from the "protection clause" and the "dominant stores clause". The provision to sublet reads, "2.12 That the Tenant, City Products Corporation, shall have and is hereby given the unqualified right of subletting the leased premises provided the *Tenant shall remain liable hereunder.*" (emphasis added)

The above provision, contrary to the contention of the Chmieleskis, is merely an option granted to the promisee-tenant City Products to sublet. The provision does not identify, describe, or express any intent by the promisor to benefit a third party. In fact, the provision is quite clear that the promisor-landlord expressly looks to the tenant as the responsible party. The fact is that the option to sublet was exclusively with City Products, and until exercised, there is no way either party (City Products or Dannen) could have intended the Chmieleskis to benefit from the "underlying lease".

As a final note, the "underlying lease" excluded a right of assignment by City Products. The evidence upon this record discloses a continual effort by City Products to secure an agreement from Dannen to reinsert the assignment clause. This is further proof there was no intent that the "underlying lease" was for the benefit of the Chmieleskis as third party beneficiaries.

Nor can the Chmieleskis claim status as third party beneficiaries by virtue of the "sublease". It is the Chmieleskis' position that the "sublease" was incorporated within the "underlying lease", and hence, they were owed the same responsibilities by Dannen as was City Products. The "sublease" dispels that contention. The sublease contains the following:

> "C.07 The rights and obligations of the parties hereto shall be as set forth in this Sublease, and it is expressly agreed that the Subtenant shall not be entitled to any of the rights or privileges accorded to the Tenant under said Underlying Lease, including but not limited to those relating to rent and options, unless said rights or privileges are specifically granted to Subtenant in this Sublease. It is expressly covenanted and agreed that no breach hereunder shall be deemed to have been waived, nor shall either party be guilty of laches, because of any failure of either party to take any action pertaining to said breach. The parties hereto shall have, for the full term of this Sublease and for any additional periods granted

under the laws of the state or jurisdiction where the leased premises are located, the full rights and remedies granted under this Sublease pertaining to any breach hereunder, regardless of the period of time that may elapse between the breach and any action taken in relation thereto. It is further covenanted and agreed that the parties hereto may, at their option, pursue any of the remedies granted herein pertaining to any breach and/or default hereunder, and the choice of any such remedy shall not be deemed to be an election of remedies and shall not preclude the exercise of any other remedies."

The sublease contains no specific grant of any rights or benefits to the Chmieleskis as subtenants with reference to the "protection clause" or the "dominant store clause".

■■■ The fact that the Chmieleskis may have incidentally benefitted from the "underlying lease" does not render them third party beneficiaries. In order for a third party beneficiary to arise, it must be shown that the benefit to the third party was the cause of the creation of the contract. *Markel v. Western Union Telegraph Co.*, 19 Mo.App. 80, 85 (1885). In this case, promises ran from Dannen, as promisor (landlord), to City Products, as promisee (tenant), and the Chmieleskis, as third parties, possessed no rights to rely upon or to enforce the "underlying lease". *Nola v. Merollis Chevrolet Kansas City, Inc.*, 537 S.W.2d 627, 633 (Mo.App.1976).

Under the whole of the evidence, it must be concluded that the parties to the "underlying lease" (Dannen and City Products) contracted for themselves. There is nothing within the terms of the "underlying lease" to clearly express the intent of Dannen and City Products that the Chmieleskis were intended third party beneficiaries. This is required. *Laclede, supra,* 596 S.W.2d at 42. It is further noted that the terms of the sublease clearly declare that City Products was not obligated to the Chmieleskis for any duty or responsibility that Dannen undertook in the "underlying lease". That such a requirement is neces-

sary was ruled in *Hardware Center, Inc. v. Parkedge Corp.,* 618 S.W.2d 689, 693 (Mo. App.1981) where the court pointed out:

"A person is a creditor beneficiary if performance of the promise will satisfy an actual, supposed, or asserted duty of the promisee to the beneficiary. *Restatement of Contracts,* § 133. Plaintiff clearly does not fall into this category. National owed it no duty which defendant agreed to undertake. Likewise, plaintiff is not a donee beneficiary. A person is a donee beneficiary of a promise if the purpose of the promisee in obtaining the promise is to confer upon the beneficiary the right against the promisor to some performance neither due, asserted nor supposed to due (sic) from promisee to the beneficiary. *Restatement of Contracts,* § 133. However, the purposes or intent necessary to create a donee beneficiary is the promisee's 'intent that the promisor assume a direct obligation to [the beneficiary].' *Stephens v. Great Southern Savings and Loan Ass'n,* 421 S.W.2d 332, 335 (Mo.App.1967). The mere desire to confer a benefit on the third party or to advance his interests or promote his welfare is not sufficient. *Id.* at 335; *see also, Laclede Inv. Corp. v. Kaiser, supra* [596 S.W.2d] at 42."

■ The whole of the evidence, comprised of the supporting documents (i.e., the "underlying lease" and the "sublease") and the additional trial evidence, upon this issue leads to the conclusion that neither Dannen nor City Products entered into the "underlying lease" because they intended to benefit the Chmieleskis. The whole of the evidence leads to the ultimate conclusion that the Chmieleskis were neither original parties to the "underlying lease", nor were they third party beneficiaries thereto. They were thus without standing to sue upon an alleged conspiracy to breach the "underlying lease".

■ In addition to the lack of standing, the record in this case fails to establish by clear and convincing evidence that a conspiracy to breach the "underlying lease" ever arose. For a claim based upon civil

conspiracy to prevail, the proof of the conspiracy must be supported by clear and convincing evidence. *Stephan v. World Wide Sports, Inc.,* 502 S.W.2d 264, 266 (Mo. 1973); *Labor Discount Center, Inc., v. State Bank & Trust Co.,* 526 S.W.2d 407, 426 (Mo.App.1975). Such evidence may be circumstantial, but it must also be clear and convincing. *Stephan* 502 S.W.2d at 266. Clear and convincing evidence "means that the court should be *clearly convinced* of the affirmative of the proposition to be proved. This does not mean that there may not be contrary evidence." *Grissum v. Reesman,* 505 S.W.2d 81, 86 (Mo.1974). In *Matter of O'Brien,* 600 S.W.2d 695, 697 (Mo.App.1980), this court reasserted the rule in *Grissum* and added:

"Another definition is found in *In Re Sedillo,* 84 N.M. 10, 498 P.2d 1353, 1355 (1972): 'For evidence to be clear and convincing, it must instantly tilt the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true.'"

 To establish a claim for civil conspiracy, the proof must be "such as to warrant a jury in finding that the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement. *America Tobacco Co. v. United States,* 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946). There must be clear and convincing proof that the alleged conspirator "knowingly performed any act or took any action to further or carry out the unlawful purposes of the conspiracy." *Contour Chair Lounge Co. v. Aljean Furniture Mfg. Co.,* 403 S.W.2d 922, 930 (Mo.App.1966). In addition and by its nature, a conspiracy has as its object or purpose the obtaining of a benefit for the conspirator. *Rosen v. Alside, Inc.,* 248 S.W.2d 638, 643 (Mo.1952).

 There is no need to restate in detail the above factual account applicable to this question, and it suffices to merely reference pertinent portions thereof.

It can be noted from above that Dwight Dannen, testifying on behalf of the Chmieleskis, disclaimed any agreement between Dannen and City Products to conspire against the Chmieleskis. The evidence reveals that Dannen contacted City Products about a change in the "underlying lease" relative to the "protection clause" and the "dominant store clause" to permit the leasing of space to the Gibson store. The evidence reveals that the Dannen-Gibson lease was signed prior to any response by City Products and without any knowledge on the part of City Products. The evidence reveals that Dannen realized City Products held two options within the "underlying lease" if the clauses were breached. Those options were to cancel the lease which would have closed the Chmieleskis' Ben Franklin store or to reduce the rental payment to a flat 4% per annum based upon gross sales produced by the Ben Franklin store. When it learned that Dannen failed to provide a Sears store and a Coast to Coast store, City Products elected to pay the reduced rental. This reduced rental was passed onto the benefit of the Chmieleskis. The evidence reveals that Dannen, in its attempt to persuade City Products to modify the "protection clause" by allowing Gibson to enter the shopping center, offered a further rental reduction to 3½% of the Ben Franklin Store. There is no evidence that City Products accepted that offer.

Dwight Dannen, testifying for the Chmieleskis, stated that City Products did not agree to Dannen's leasing of space to Gibson. He further testified that Dannen did not inform City Products of the Gibson lease until the Gibson lease had been executed. The evidence suggests that the Chmieleskis brought the opening of the Gibson store to the attention of City Products.

In contrast, the Chmieleskis contend that the evidence was clear and convincing to establish a conspiracy between Dannen and City Products. In support of this contention, they refer this court to the following. There was in evidence a letter dated May 19, 1970 (some 3½ years after the execution of the entry of the Gibson store) from counsel for Dannen to a representative of City Products. This letter was written relative

to a demand by Dannen for possession of the premises occupied by the Chmieleskis' Ben Franklin store. The pertinent portion of that May 19, 1970 letter reads: "Soon after the opening of the shopping center, Gibson's desired to rent space, and after much correspondence, you suggested for the time being the Lessor was *safe* in going ahead and you would remit on the basis of 4% of gross receipts."

It must be first noted that the foregoing letter was a demand letter for possession of the leased premises, and was executed at a time when Dannen and City Products were in an adversarial position (i.e., Dannen as landlord was demanding the surrender of the leased premises from its tenant, City Products). The foregoing letter makes no reference to a date or time when the representative of City Products "suggested for the time being the Lessor was *safe* in going ahead ...".

At the time of his testifying, Dwight Dannen was asked about the letter of May 19, 1970. The record reveals the following:

"Q. Now, I'm going to ask you if indeed there were not correspondence and communications from City Products indicating to Dannen Corporation that it was okay or safe as far as Dannen Corporation was concerned for Gibson's to be—go ahead and go into the shopping center? A. I think there's a letter from David Morton to City Products saying—using the word safe. I don't think City Products ever told us it was safe to go ahead. Q. But they say it was okay? A. I don't think they ever said it was okay. In fact some of the documents you've presented indicate that they never considered it was okay. When we tried to get them to go on a base rent like they were supposed to do they used that as an excuse for not doing that."

Dwight Dannen then further testified:

"A. That's ridiculous, Mr. McCollum. We wouldn't have done such a thing, and it's ridiculous to think that a big company like City Products would make any kind of a deal with a little company like ours. There's no reward for them to do that.

It's not conceivable. We made no kind of an agreement with them except at the beginning of the lease period. We let Gibson come into that shopping center because Ben Franklin had an option in the lease if we did it. They had two options. They could cancel the lease or they could go on the percentage rent basis, and they elected to go to the percentage rent basis. We made no kind of deal with them at all, simply what's written in that agreement."

It must be remembered that the "underlying lease" was never modified to allow the entry of Gibson into the center. The absence of that modification left Dannen as landlord in a position of default or breach under the terms of the "underlying lease". The language in the foregoing letter is that of Dannen's counsel. Absent the author of that letter being called as a witness to explain the statement, it is as reasonable to assume that the statement was included for the purpose of protecting Dannen as it is to assume it was an accurate statement of the representative of City Products by whom the letter was addressed. The representative of City Products to whom the assurance was made that it was "safe" died prior to the completion of his deposition and trial, and thus, the record contains no explanation by him either.

The Chmieleskis further direct attention to an interrogatory, introduced over objection, executed by Dannen which they contend reveals clear and convincing evidence of the conspiracy. The interrogatory originated during litigation in which Dannen sued City Products and the Chmieleskis for possession of the premises. Dannen and City Products were in an adversarial position. The admission of this interrogatory is questionable, and moreover, it cannot be held to be binding against City Products. *Pyles v. Bus Lines, Inc.,* 427 S.W.2d 790, 792 (Mo.App.1968). The interrogatory states conclusions by Dannen as to the representative of City Products. In addition, during the examination of Dwight Dannen, he was asked about this interrogatory. His response was: "If I remember right, Mr.

McCollum, our attorneys even filed a correction to that because there were never any consents or agreements between us and City Products."

The record herein goes wanting to establish by clear and convincing evidence that City Products and Dannen entered into a civil conspiracy to damage the Chmieleskis. One gnawing and perplexing question persists throughout this entire issue of a conspiracy. That question is: What would either City Products or Dannen have to gain by the failure of the Chmieleskis' store? The financial success of both City Products and Dannen directly rested upon the success of the Chmieleskis.

■ From the whole of the evidence, it cannot be concluded that the Chmieleskis made a submissible claim for conspiracy against City Products. Their claim failed for two prime reasons. These reasons were the failure of the Chmieleskis to establish that they were third party beneficiaries to the "underlying lease", and secondly, there is no clear and convincing evidence that a conspiracy originated between City Products and Dannen against the Chmieleskis to breach the "underlying lease". The trial court erred in not directing a verdict for City Products on Count I of the Chmieleskis third amended petition.

The record reveals that the jury herein was instructed on punitive damages upon Count I of the third amended petition (i.e., the conspiracy count) only. This court has concluded that the Chmieleskis failed to make a submissible case on the issue of conspiracy, and upon that finding, the award of punitive damages in the sum of $945,800 is set aside. In their general verdict, the jury also awarded the sum of $224,000 in actual damages. This matter is discussed infra.

Point (1) is sustained to the favor of appellant City Products, and the portion of the judgment pertaining to Count I (conspiracy) is reversed.

Point (2) presented by City Products includes numerous subpoints. The point charges that the trial court erred in entering judgment on the jury's verdict to the extent that the verdict was returned on the claim of breach of fiduciary duty. Within that general charge, City Products presents no less than ten subpoints. Because this portion of the judgment must be reversed, this opinion does not take up and discuss all the points submitted, but rather, only those necessary to the disposition herein. Nonetheless, the varied subpoints are summarized as follows:

(a) No fiduciary relationship exists as a matter of law between a franchisor and franchisee whose respective rights and duties are governed by written contract.

(b) There is no sufficient evidence that a fiduciary relationship existed between appellant and respondents.

(c) Verdict-directing instruction was erroneous (herein City Products lists five separate challenges to the instructions which, since they do not enter into the disposition of the charged error, are therefore not listed).

(d) There was no substantial evidence that appellant breached any duty or that any such breach caused damages to respondents.

(e) Any breach of any fiduciary duty occurred more than five years prior to the filing of the claim therefor, and hence was barred by the statutes of limitations, § 516.100/516.120, RSMo 1978.

For purposes of disposition herein, only (a) is taken up by this opinion.

The Chmieleskis contend that there was a fiduciary relationship created by the franchise agreement, and because of the "particular nature of their (Chmieleskis' and City Products') relations." They charge that "it must be noted at the outset that plaintiffs (Chmieleskis) do not, as defendant (City Products) suggests, contend that the mere existence of a franchisor-franchisee relationship *always* creates a fiduciary duty. Plaintiffs claim only that *their* particular relationship with City Products gave rise to a fiduciary relationship which created an affirmative duty on City Products' part to protect and safeguard the Chmieleskis'

business interests and to allow them to develop their franchised Ben Franklin store."

In support of the foregoing position, the Chmieleskis direct attention to the following. First is the "immense disparity" with respect to the bargaining power of the parties. The Chmieleskis suggest that since City Products is a large diversified corporation, "the very existence of which in the retail industry depends upon its ability to organize and exert a large degree of control over its franchising operations", this is one reason to conclude that there was a fiduciary relationship created. In addition, they point out that they were required to operate the Ben Franklin store in accordance with the operating and distributing policies of City Products within the terms of the franchise agreement. They assert that City Products "had almost complete control" over the Ben Franklin Store, including many daily decisions. Cited as an example, the Chmieleskis reference the testimony of the controller for City Products which included the "directing" of Mr. Chmieleski to reduce store inventory by some $10,000, the placing of the store on an "open to buy budget", the review of the Chmieleskis' purchases, and the giving of "permission" for additional purchases if the controller thought them necessary.

At this juncture, the precise evidence on this latter point needs review.

In the first instance, the reduction of inventory, the open-to-buy budget practice, and the permission to purchase merchandise were, as the evidence reveals, all measures undertaken by City Products as a result of default of payment by the Chmieleskis for merchandise acquired by them from City Products. These "measures" were not and should not be construed as everyday operational activities of the Ben Franklin store exerted by City Products over the Chmieleskis. These "measures", undertaken from a "financial standpoint", were caused by the account delinquency of the Chmieleskis with City Products.

The Chmieleskis further contend that a fiduciary relationship is proven because City Products acted "as the Chmieleskis landlord, supplier, creditor, and business advisor." They further point out that the sublease required that they use the leased premises exclusively for a Ben Franklin store, and give City Products the right to terminate the sublease if the franchise agreement expired or if they defaulted in payment of any monies due City Products.

There exists no authority that this court can find which enumerates any one or any number of specific factors which leads to a conclusion that there is or is not a fiduciary relationship. Stated another way, our courts have not declared, "since the franchisor acts as landlord, etc." there is or is not such a relationship. Rather than enumerate the specifics, our courts have prescribed necessary basic elements which give rise to a fiduciary relationship. In a 1931 decision, *Patton v. Shelton,* 328 Mo. 631, 40 S.W.2d 706, 713 (1931), a will contest case, our state supreme court pointed out:

"[I]n every instance of a confidential and fiduciary relation of a nature that calls into action the presumption of undue influence there are two persons, one of whom is subservient to the dominant mind and will of the other by reason of the age, state of health, illiteracy, or mental debility of the subjected one. Since all of these cases concern property passing by deed or by will, there are also present in every case land, funds, a going business, or other things of value, which belong to the subservient one, but which often are possessed or managed by the controlling person. In some cases the person of influence with the owner merely advises concerning the property. We find in many of these cases also a control of the subject person by the other, due to the age or the mental or physical debility of the one having the power of disposition of property."

Further, in the case of *Gibson v. Gibson,* 534 S.W.2d 100, 104 (Mo.App.1976), it was declared:

"[A] confidential relationship is synonymous with a fiduciary relationship, and extends to instances in which a special confidence is reposed on one side and

there is resulting *domination and influence* on the other."

From the foregoing authority, certain basic elements necessary to the establishment of a fiduciary relationship arise. In summary, these are: (1) as between the parties, one must be subservient to the dominant mind and will of the other as a result of age, state of health, illiteracy, mental disability, or ignorance; (2) things of value such as land, monies, a business, or other things of value which are the property of the subservient person must be possessed or managed by the dominant party; (3) there must be a surrender of independence by the subservient party to the dominant party; (4) there must be an automatic or habitual manipulation of the actions of the subservient party by the dominant party; and (5) there must be a showing that the subservient party places a trust and confidence in the dominant party.

What the evidence reveals in this case is a large corporate entity that entered into a contractual relationship with the Chmieleskis. At the time of the contractual origin, Mr. Chmieleski was possessed of some 15 years experience in the retail variety business. Mrs. Chmieleski was possessed of experience in the banking business. The evidence on this record does not support the finding of any of the above required elements to establish a fiduciary relationship. What the evidence does reveal is an arms-length bargained-for contract reduced to writing within which each party was to perform certain duties in exchange for performance by the other party.

There is nothing in the evidence which supports the conclusion that City Products ran the Ben Franklin store on a daily basis. City Products was not permitted, either by the agreement or any other "relationship", to share in the profits and losses of the Ben Franklin store. The evidence revealed that the Chmieleskis were free to and did purchase merchandise from other suppliers. The evidence revealed that they were free in management decisions, i.e., pricing, advertising, hiring of personnel, store hours, etc. From the evidence, it is obvious what occurred. In those instances where City Products provided suggestion, assistance, advice, etc., as City Products agreed to do via the agreement, various results occurred. In some instances, the Chmieleskis followed the advice. In others, the advice was not followed. There was evidence that Mr. Chmieleski viewed the "zone men" (the field consultants and merchandising advisors) as "useless".

A review of both the franchise agreement and the other evidence of the relationship between the parties leads to the conclusion that there was no fiduciary relationship created as a matter of law. The franchise agreement, the sublease, and the relationship of the parties from other evidence clearly shows an interdependent or cooperative business relationship. The franchise agreement denotes clearly the relationship between the parties. It reads:

"It is mutually understood and agreed that the Owner is not the Agent of Distributor for any purpose, and that Owner retains full responsibility for the financing, management and operation of the Owner's store. Owner acknowledges that he may have been given or seen sales forecasts and other projections provided by the Distributor or its employees, either referring to the location covered by this franchise or otherwise, but the Owner hereby stipulates and agrees that neither such materials nor any statement made by the Distributor or any employee thereof is intended to be or shall be deemed to be a representation, warranty, guaranty or indemnity of any nature, regardless of by whom or how asserted, and the Owner agrees that the Distributor shall not be responsible for the results obtained in the operation of said store or liabilities incurred thereby."

It has long been the rule in our state that the existence of a business relationship does not give rise to a fiduciary relationship, nor a presumption of such a relationship. *Sewell v. Ladd,* 158 S.W.2d 752, 757 (Mo.App.1942).

Research has revealed that in most instances where a fiduciary relationship has

been held to have existed from business relations, such findings have been in conformity with statutory requirements, or in furtherance of public policy. Neither situation applies in the instant case. As regards franchises, our statutes are limited and provided in § 407.405, RSMo 1978:

"407.405. Pyramid sales schemes prohibited-cancellation of franchise without notice prohibited, exceptions

No person shall, directly or through the use of agents or intermediaries, in connection with the sale or distribution of goods, service, or other property, sell, offer or attempt to sell a participation or the right to participate in a pyramid sales scheme. No person who has granted a franchise to another person shall cancel or otherwise terminate any such franchise agreement without notifying such person of the cancellation, termination or failure to renew in writing at least ninety days in advance of the cancellation, termination or failure to renew, except that when criminal misconduct, fraud, abandonment, bankruptcy or insolvency of the franchisee, or the giving of a no account or insufficient funds check is the basis or grounds for cancellation or termination, the ninety days' notice shall not be required."

The evidence upon the record before this court reveals that the Chmieleskis were not only entitled, but were obligated to the day-to-day management of the Ben Franklin store. The description of the inter-working and inter-business relationship between City Products and the Chmieleskis is best summed up by the United States District Court, Western District-Washington in the case of *Anderson v. General Motors Corp.,* 154 F.Supp. 927, 930 (W.D.Wash. 1957), affirmed 275 F.2d 63 (9th Cir.1960):

"The agreements contemplated the operation of the distributorship as a business enterprise, separate and apart from the operation of the defendant's business to the extent that defendant received no share of the plaintiff's profits, undertook to assume or satisfy no losses in plaintiff's business, had no vote in its corporate meetings, had no stock in the plaintiff corporation, and had no representative either as a member of plaintiff's board of directors or as a corporate officer."

While the Chmieleskis strongly argue they reposed confidence and trust in the personnel of City Products, the evidence does not support such claim. As noted above, Mr. Chmieleski thought that the "zone men" (and their advice) were "useless". The suggestions of replacement of staple merchandise, replacement of promotional inventory, and the use of circular form advertising were often ignored by Mr. Chmieleski. In one instance where the circular advertising was used (City Products paid one-half the production and distribution cost), the sales of the Ben Franklin store increased. When City Products elected to discontinue payment of one-half the costs, the program was abandoned by Mr. Chmieleski and sales declined. These factors illustrate just a few of the examples of management independence retained and exercised by Mr. Chmieleski relative to the management and operation of the Ben Franklin store.

There is no statutory or public policy factor within or applicable to the facts and circumstances of the instant case to warrant the creation of a fiduciary relationship between the franchisor (City Products) and the franchisee (the Chmieleskis). In addition, there is nothing within the written franchise agreement nor any evidence additional thereto that describes the Chmieleskis as reposed of any trust or confidentiality in City Products within the meaning of the term fiduciary relationship. Concerning the consideration of the requisite elements as prescribed by *Gibson* and *Patton,* this record denotes that these elements (either within the written franchise agreement or the remainder of the evidence) go wanting.

■ The record does reveal that two parties entered into a franchise agreement. Neither party was a stranger to such a business relationship. The terms of the franchise were set forth in specific detail. The evidence extrinsic to that agreement

simply fails to depict the creation of a fiduciary relationship between the parties. There was no fiduciary relationship as between these parties as a matter of law, and the trial court erred in submitting Count III of the third amended petition to the jury.

Point (2) is sustained to the favor of appellant City Products, and the portion of the judgment pertaining to Count III (fiduciary relationship) is reversed.

Turning to the final point (3) presented by City Products, this point is subdivided. In this instance, the point is subdivided into some eleven subpoints. The charged error is that the trial court erred in entering judgment upon the jury's verdict to the extent that the verdict was returned on the claim of breach of contract.

▮ In the main, City Products contends that there was no substantial evidence that it breached any promise to the Chmieleskis, or that any alleged breach was material that would give rise to damages.

Under Count IV of their third amended petition, the Chmieleskis alleged that City Products failed and refused to provide merchandising, retail, operating, promotional, and advisory services as promised in the franchise agreement. The Chmieleskis also alleged that City Products failed to supply merchandise "check lists", and failed to sell them merchandise upon the same terms, prices, payment, and delivery as City Products extended to other franchisees.

The evidence reveals that City Products placed the Chmieleskis on a "check with order" form of merchandise purchasing. The evidence reveals that no other franchisee was ever dealt with on such a basis. The evidence reveals that City Products insisted on such a purchase plan, because the Chmieleskis were in default on the indebtedness due City Products. However, the evidence reveals that this procedure continued after the Chmieleskis became current on their indebtedness due City Products.

The evidence also reveals that the "zone men" stopped calling on the Chmieleskis. City Products explained this as excusable,

because the Chmieleskis' store was not performing and the store had no future.

The pleadings pursuant to Count IV of the Chmieleskis' third amended petition reveal that they stated a claim for breach of contract. The evidence, if believed by the jury, supported a claim for a breach of contract (i.e., the franchise agreement), and the trial court did not err in the submission of that claim to the jury.

The error, or more correctly, the errors which attended the submission of the claim for breach of contract do not pertain to the substantive claim for breach of contract, but rather, those errors center upon the verdict-directing instruction related to this claim and the evidence permitted in support of the claim for damages.

▮ Concerning the instructional error, the verdict-directing instruction was erroneous because it submitted in the disjunctive two promises allegedly breached which were not pleaded. Paragraph (45) within Count IV of the Chmieleskis' third amended petition alleges:

"45. City Products, pursuant to the said franchise agreement is entered into with the Chmieleskis attached hereto as 'Exhibit A', contracted and agreed that it would provide the Chmieleskis with retail, merchandising, operating, promotional and other 'personal' services, advice and assistance to aid the Chmieleskis in establishing and maintaining their new Ben Franklin store in the said Southtown Shopping Center and help them with any 'special' problems relating to the operation of their said Ben Franklin variety store."

The verdict-directing instruction reads as follows:

"First, plaintiffs and defendant entered into a Franchise Agreement for the Ben Franklin store in the Southtown Shopping Center whereby: ...

defendant promised to furnish the plaintiffs for use in their store basic stock lists of merchandise known as the merchandise check list and through supplemental and seasonal check lists to keep it adjust-

ed to conditions, markets and consumer demand and also to supply to plaintiffs general listings of other merchandise desired by plaintiffs to supplement the basic stock merchandise carried by plaintiffs, and

defendant promised to sell plaintiffs merchandise upon such prices, terms of payment and delivery as those quoted by the defendant from time to time in accordance with its current practices to like stores and the credit standing of the owner, ..."

The Chmieleskis contend that even if not properly pleaded the issues within the instruction were submissible under the rule that if evidence upon an issue is admitted without objection, the pleadings are deemed amended to conform to the evidence. *Barber v. Allright Kansas City, Inc.,* 472 S.W.2d 42, 45 (Mo.App.1971); Rule 55.33(b). The problem with this argument is that it has no application to the instant proceedings, because the record revealed that City Products timely objected in two instances. Initially, City Products did so by a motion in limine prior to trial. The remaining objections occurred at trial on two separate occasions. The objections were premised upon the basis that the evidence was beyond the scope of the pleadings and immaterial to any issue in the case. The trial court erroneously overruled these objections, along with City Products' pretrial motion in limine. The result is that the verdict-directing instruction submitted in the disjunctive two issues which were not pleaded. This was error. *Zipp v. Gasen's Drug Stores, Inc.,* 449 S.W.2d 612 (Mo.1970); *Kells v. Pevely Dairy Co.,* 393 S.W.2d 61 (Mo.App. 1965). The record reveals no request by the Chmieleskis to amend their petition.

The portions of the judgment pertaining to Count III (breach of contract) must be reversed, and the cause remanded for retrial upon the claim for breach of contract.

Because of the manner in which the actual damages were presented to the jury, coupled with the form of verdict returned by the jury, a discussion of the actual damages awarded must be presented herein.

The record reveals that the jury returned a general verdict consisting of $224,000 in actual damages and $945,800 in punitive damages. There is nothing discernible from the verdict to determine to what count the jury assessed the actual damages. The question of the punitive damages has been discussed above, and the record shows that the jury was, by instruction, limited to the award of punitive damages to Count I, the conspiracy claim. Disposition of that claim, along with the punitive damages, has already been made above, and no further discussion of the punitive damages need be undertaken.

By their pleadings, the Chmieleskis sought recovery of damages based upon three separate elements of damages which, as summarized, were: (1) loss of future profits; (2) the diminished value of their business; and (3) unrecouped investment in the Ben Franklin store.

City Products attacks the evidence upon this record regarding (1) above (i.e., loss of future earnings) as being too speculative. This court agrees.

The record shows that the Chmieleskis testified as to their actual earnings for the period of 1966–1974. These were:

1966—$5,406 (loss)
1967—$1,100 (loss)
1968—$1,931 (profit)
1969—$476 (profit)
1970—$2,897 (loss)
1971—$5,175 (loss)
1972—$1,190 (loss)
1973—$1,182 (loss)
1974—$406 (profit)

In addition to the foregoing, the Chmieleskis produced an expert witness to testify as to their loss of profits. If it is assumed for the sake of discussion that the jury made an award of actual damages based upon evidence of alleged loss of future earnings, then it must follow that the jury found the testimony of Chmieleskis' expert very persuasive. As will be observed infra, the testimony of the expert caused the claim of loss of future earnings to be speculative.

In summary, the expert took "income opportunity figures" from what has been referred to as a 1965 "Ben Franklin Store Proposal". This document was prepared in contemplation of the location of the Ben Franklin store in the Southtown Shopping Center. This document contained a workup of the investment required, plus an "income opportunity" provision. This "income opportunity" provision projected $100,000 (maintained gross profit) for the first year and $110,000 for the third year.

Immediately below the financial compilation, the following is found on the fact of the document:

> "This investment and opportunity, which is predicated on good operating performance by me or my manager, has been explained in detail. I understand that these figures and forecasts are based upon estimates made in the best judgment of Butler Brothers' employees from available facts. They are for general guidance only and do not represent a guarantee of performance."

It is evident from the testimony of the expert that he took the above figures of $100,000 and $110,000, and inferred a figure for the second year. He then utilized the Consumer Price Index for the years 1969–74 to account for inflation, and multiplied the third year figure ($110,000) by the percentage represented by the Consumer Price Index. He derived a final figure of $123,683 as representing loss of profits for the years 1966–74.

■ The loss of future profits is a valid claim, but in support of such a claim "the evidence must be sufficiently definite and certain for the jury to make a reasonably accurate estimate of the loss without resorting to speculation." *Jack L. Baker Co. v. Pasley Manufacturing & Distributing Co.,* 413 S.W.2d 268, 270 (Mo.1967). Because future profits are considered "too remote, speculative and too dependent upon changing circumstances", our courts have viewed the recovery of such losses cautiously. *Coonis v. Rogers,* 429 S.W.2d 709, 714 (Mo. 1968); *Morrow v. Missouri Pacific Railway*

*Co.,* 140 Mo.App. 200, 123 S.W. 1034, 1038 (1909).

City Products directs this court's attention to the rule announced in *Coach House of Ward Parkway, Inc. v. Ward Parkway Shops, Inc.,* 471 S.W.2d 464 (Mo.1971). Before discussing the rule in *Coach House,* it is noted that the Chmieleskis contend that the rule therein is not applicable because they proved their lost profits in an entirely different manner than that prescribed in *Coach House,* i.e., these losses were based upon their own sales and profit history, and on sales and profit projections provided by City Products. This court is not persuaded by the claimed validity of the distinction between this case and that of the rule in *Coach House.* The key to the entire dispute is the validity of the sales/profit projections made in 1965 by City Products. The Chmieleskis would urge that these figures are fixed, accurate figures not subject to the influence of any other factors.

The bottom line is that the sales/profit projections are just that, projections. To be sure, they are calculations that someone (the identity of the author of this document is not disclosed in the record) with City Products compiled and included within the store proposal. However, the document itself clearly cautions that these figures are subject to other contingencies. For example, it is observed that the projections are premised upon "good operating performance." The document cautions that the projections are premised upon "available facts". Further, it is noted that the projections are "for general guidance only and do not represent a guarantee of performance." In order for these sales/profit projections to be a fixed accurate constant, it would have to be assumed that there was continual "good performance" and that "available facts" remained the same. As noted infra, certain events occurred subsequent to the "projection" and before the calculations made by the expert, which by his testimony, he did not include in his determination.

In *Coach House,* our state supreme court recognized certain factors deemed appropriate and applicable for the purpose of calcu-

lating loss of profits. It is first noted that the judgment in *Coach House* was reversed because the expert testimony *was excluded.* In the instant case, the challenge is made to the admission of the evidence. Nonetheless, the principles announced in *Coach House* directly bear upon the instant case. The court first noted that the expert had conducted several examinations of stores comparable to the complaining store, particularly in conjunction with counseling developers of shopping centers. This conduct included advice upon tenant mix and location of particular stores within and as part of an overall shopping area. The court further noted that the expert based his opinion upon other factors which included actual sales data from the complaining store for a given period of time, actual sales from of another store within the shopping center for a given period, total sales of the shopping center for a given period, and consideration of tenant mix in the shopping center with an analysis of the change in the tenant mix and the effect of that change, if any, relative to the effect of these elements upon the diversion of sales away from the complaining store. The court in *Coach House* concluded that the testimony of the expert did not create such uncertainty as to render that testimony wholly lacking in probative value.

In the instant case, the expert appearing on behalf of the Chmieleskis stated that he had no expertise relative to variety store operations. He further stated that he never was in either the Chmieleskis store or the Gibson store (it being remembered that throughout this entire proceeding, the Chmieleskis have contended that the Gibson store was their main competitor). This expert witness further acknowledged that he was not familiar with the economic conditions of Livingston County and/or Chillicothe, Missouri. In his analysis in reaching his conclusions, this witness made no use of the actual sales of the Chmieleskis' store, the Gibson store, or the Southtown Shopping Center. This witness was not able to offer any opinion or judgment relative to the number of sales the Chmieleskis' store perhaps would have realized if it had not

been for the competition of the Gibson store. Moreover, the expert assumed the purchasing power of the residents of Chillicothe as a constant during the period of 1966–1974. He took the projected sales/profit projections which originated in 1965 and did not, by his own admission, calculate for the opening of additional variety retail stores in the area, although he admitted that the opening of these additional stores was "potentially meaningful". He further admitted to going back to 1965, adopting the sales/profit projections, making his calculations, and ignoring basic economic data applicable to the Chillicothe area which was available to him. It must be remembered that the "underlying lease" provided that the inclusion of a discount store (such as Gibsons) of a size not in excess of 5,000 square feet was permissible at the option of the landlord (Dannen) without agreement by the tenant (City Products) or modification of the "underlying lease". The expert herein not only did not in any manner account for the Gibson store, but he gave no consideration as to the difference that store might have made with regard to the additional 3,500 square feet which the "underlying lease" prohibited.

■ The conclusion which must be reached is that the trial court erred in admitting the testimony of the expert for the Chmieleskis, because that testimony lacked a sufficient basis for the opinion rendered by the expert. *Coach House, supra.* The expert took the sales/profit projections for two of the three years (first year and third year), prescribed a projection for the second year, and applied the Consumer Price Index to derive his opinion. This rendered his opinion too speculative. *Coach House, supra.*

■ As a further attack upon the award of actual damages, City Products contends that the jury award in no way reflects consideration of the claimed loss of the Chmieleski's investment and/or the diminished value of their store [i.e., (2) and (3) above].

It is pointed out to this court that the Chmieleskis testified to an initial investment of $26,749.68 in their Southtown store. This investment occurred in 1966. The Chmieleskis invested an additional sum of $3,500 in 1969. The evidence further reveals that the Chmieleskis (between 1966–1972) borrowed funds totaling $45,000. These loans were obtained to purchase merchandise for their store. The evidence reveals most of these loans were repaid, but when the store finally closed its doors in 1974, the Chmieleskis were left with a $11,000 liability on these loans. While the Chmieleskis testified that there was interest charged on the loans, neither testified as to the amount of the interest on any given loan or a total of the interest charged to them.

City Products argues that the total figure for the claimed loss of investments is $41,250. From this, it is argued by City Products that there is no evidence to support the difference ($172,317) between the sum testified to by the Chmieleskis as their lost investment ($41,250) and the jury's award. This court agrees that there is nothing in the evidence to support this disparity.

It is noted that City Products does not challenge the validity of a claim for lost investment, but merely challenges the amount of the award as not being supported by the evidence.

Both parties suggest to this court that, if this court disagrees with the award of actual and punitive damages, they would welcome the court entering remittitur as opposed the retrial of this matter.

It is understandably clear that this court has the authority to order remittiturs, but it is the opinion of this court that this case does not lend itself to that ready disposition. The reason is that the Chmieleskis are entitled to offer evidence upon the issue of loss of profits in conformity with the rule in *Coach House*. There is nothing in this record upon which this court can affix an amount to apply remittitur, and at the same instance, permit the Chmieleskis their opportunity to present evidence upon their claim of loss of profits.

This opinion does not reach or address the remaining contentions of City Products relative to its claim of erroneous instructions or the Chmieleskis' failure to mitigate their damages. It is assumed that if this matter is retried in compliance with the decision herein, that both of those issues will be appropriately addressed and the trial court will safeguard against any possible error in regard to both.

It is the decision of this court that the portion of the judgment pertaining to Count I (conspiracy) is reversed and all damages awarded relative thereto are set aside. It is the further decision of this court that the portion of the judgment pertaining to Count III (fiduciary relationship) is reversed and all damages awarded relative thereto are set aside. It is the further decision of this court that the portion of the judgment pertaining to Count IV (breach of contract) is reversed and the cause is remanded in its entirety with regard to Count IV (breach of contract) only.

All concur.