Don GIBSON, Plaintiff-Appellant,

v.

Roy GIBSON and Mabel Gibson,
Defendants-Respondents.

No. 36631.

Missouri Court of Appeals,
St. Louis District,
Division Four.

Feb. 17, 1976.

Roberts & Roberts, Geoffrey T. Pratte, Raymond R. Roberts, Farmington, for plaintiff-appellant.

Dearing, Richeson, Roberts & Wegmann, Nicholas G. Gasaway, Hillsboro, for defendants-respondents.

NORWIN D. HOUSER, Special Judge.

Suit in equity to establish a constructive trust in real estate in St. Francois County. Plaintiff is Don Gibson. Defendants are plaintiff's father Roy and plaintiff's stepmother Mabel Gibson. The circuit court denied relief. Plaintiff appeals on the principal ground that the court erred when at the close of the evidence for plaintiff the court decided the case for defendants; that sufficient grounds for the imposition of a constructive trust were proven by cogent and convincing evidence; that the ruling was against the clear weight of the evidence and constituted an abuse of discretion.

We will refer to plaintiff as "son"; to defendant Roy Gibson as "father"; to his natural mother as "mother," and to defendant Mabel Gibson as "stepmother."

Son testified as follows: Father was in the chicken business as far back as son could remember, on land son knew was leased by father from St. Joe Lead Company near Elvins. When son was released from Navy service in 1944 he announced to father and mother that he intended to buy a farm and go into the poultry business. The parents told son to locate on the part of their leased land on the other side of the highway and the land would be "his." Son, relying upon this, established his home and business on that land. Parents loaned son money; advanced feed to him on credit and carried the feed bill. From 1949 to 1953 son bought baby chicks from father. Father cosigned a $3,600 note at the Bank of Irondale for son, and father eventually paid the balance due on the note, which son was "sure" was $1,600. On another occasion in the 1950s father loaned son $1,800, all but $800 of which son repaid. Son received other loans from father from time to time.

Parents and son entered into no sublease or other writing pertaining to the land. No conveyance was made by parents to son of any interest therein. Son paid for his purchases from parents from time to time and operated his business for several years, until competition and loss of several major accounts forced him to quit. Son did not pay parents rent on the land, nor did son pay taxes on the land at any time. From time to time while in business son erected brooder houses and other buildings of various kinds the total cost of which he estimated at between $19,000 and $20,000. Son installed roads, electricity and water lines. In 1951 father and mother purchased from St. Joe Lead Company the land which they had previously leased from that company. The deed created a tenancy by the entireties in the parents. Son paid no part of the purchase price. During the 1950s four of the buildings were sold by son and dismantled. Son kept the proceeds. Mother died in 1955. Father married stepmother Mabel in 1957. From 1945 to 1959 various members of the family referred to the property as "his [the son's] side of the highway." Son closed his poultry business in 1959; went into the trucking business, and moved to California. Father and son began having trouble in the 1950s. Son testified that his father had threatened him; that on one occasion father came to son's house with a loaded shotgun and "stuck it in [his] door." In 1959 son still owed $1,600 "or probably less" than $1,600 on the largest building. Son, unable to pay, gave father $300 to pay on the debt, asked father to pay the balance, and told father that for so doing father could use the buildings. Father made no statement at that time as to whose property it was. Father thereafter rented the building, collected the rent and made apartments out of another of the buildings. After leaving the property in 1959 son made no payments on the cost of improvements thereafter made by father on the buildings. Son visited father and stepmother in 1963 and 1966 and thereafter at approximately six-month intervals. On these occasions son stayed at a motel and not at the home of father and stepmother because stepmother "offered [him] no hospitality." On one trip she said father would shoot son if father saw him. Son identified mother's unprobated will and read paragraph 3 purporting to devise the land in question to son and cancelling all debts owed by son.

Son's sister Melba could not recall whether in 1944 her parents stated that the land was to be son's, but she testified that the land across the highway was referred to as "Don's side of the highway." Sister Gloria Stricklin testified that when son left the Navy parents told son he could have the land on the other side of the highway; that the land was referred to as "Don's side of the road"; that she bought ground from father on "Don's side" of the highway and lived there 14 years. She knew some land on Don's side had been sold to third parties, but had not told Don because she "figured" Don's land was "where the buildings was" and not the whole tract.

At the close of plaintiff's evidence the judge stated that it takes clear, cogent and convincing proof to establish a constructive trust; that "there just isn't that type of proof to sustain it made by the Plaintiff," and that any evidence of a constructive trust was destroyed by sister Gloria's testimony that she believed the land belonging to Don was the portion *where the buildings were located,* and the court entered judgment for defendants.

■ Citing *March v. Gerstenschlager,* 436 S.W.2d 6 (Mo.1969) son asserts that *a court of equity will use the machinery of a trust to provide a remedy in cases of actual or constructive fraud, to prevent unjust enrichment, or to rectify the result of a violation of confidence reposed in another.* Son does not contend that his parents or his stepmother were guilty of actual or constructive fraud. He relies upon the existence of a confidential relationship between him and his parents, breached "when [his] father deeded away part of the land upon which [he] had erected the buildings," and

contends that this is a case of unjust enrichment. Our review is limited to a consideration of the case upon the trial theories adopted by plaintiff. *Lee v. Smith,* 484 S.W.2d 38, 41 (Mo.App.1972).

■ The property leased to parents and later acquired by them by deed of conveyance consisted of a tract of approximately 14 acres, bisected by Highway No. 32. Father and mother lived on the east side of the highway. Son's use was confined to that part of the tract lying on the west side. Strangely, son filed suit to impress a trust not only on the west portion he occupied but on the entire 14 acres, including the east part where father and stepmother lived, although son never intended to claim the east part. Son's uncertainty as to the nature and extent of his claim is further illustrated by the fact that he pleaded a cause of action for an *express* trust in Count I, a position abandoned by his counsel in opening statement. In Count II he sought to impress a *constructive* trust on the entire 14-acre tract, but at trial confined his claim to a constructive trust in the land on the west side, further restricting his pretension to that portion of the west side not previously conveyed to third party purchasers from defendants. Another self-imposed limitation of the interest claimed was son's concession of a life interest to his father. Son originally prayed for an accounting of rents and profits from 1957 to date but the accounting prayer was abandoned at trial. Son's witness Gloria Stricklin, called to corroborate his testimony that parents always acknowledged he was entitled to the land west of the highway, threw further doubt on the extent of son's claim by disclosing that she considered his interest confined to the land on which the buildings were erected and that it did not include all remaining unconveyed land lying west of the highway. Other questions arise to becloud the issue. Son claims it was not until 1973 that he learned that his father treated the land on the west side as otherwise than the property of son. This assertion cannot be reconciled with the fact, of which son must have been aware for many years, that as early as 1953 parents conveyed a lot on the west side to his sister Gloria Stricklin and her husband, who built a house and lived there for 14 years. The land records show that prior to that conveyance parents conveyed another part of that tract to Melvin Meador and wife. Yet son made no effort to investigate the records and take action to vindicate his supposed rights for nearly 25 years. Long delay in making a claim to a constructive trust militates against a finding of clear and convincing evidence. *Hendrickson v. Syverson,* 82 N.W.2d 827 (N.D.1957). Son brought this action nearly 20 years after his mother's death, 17 years after his father's remarriage and 10 years after his father suffered a stroke.

Son's clearest characterization of the 1944 "agreement" between son and parents is his testimony that his parents " * * * said there wouldn't be any need for me to buy a farm; that I could locate my buildings on the other side of the highway and the highway was to be mine, or the property was to be mine." Son's most confused version of his claim is found in this exchange: "Q And is what you are asking the Judge for, as I understand you today, is for the property on the [west] side of the highway? A Well, in the event I, I don't know if I either I'm entitled to the property or does anyone else." At best his testimony, and that of his sisters, is inconclusive and lacks specificity. Son did not testify that parents promised to convey the land to him by deed but rather that they said the land would be "his." His to use or his to hold in fee simple? His temporarily on leased land, to get started in business, or his to own outright forever? This testimony is questionable in light of the fact that in 1944, when the "agreement" is alleged to have been made, parents did not own the land but held only a leasehold interest, and therefore were in no position to invest title to a part of it in their son. The sisters' testimony that the land was referred to through the years as "Don's side of the highway" is

equally susceptible of differing interpretations. Did "Don's side" refer to place, location and identification of the land or to ownership? Either conclusion would be equally logical. Son's contention that in effect the title passed to him in 1944 is effectively rebutted by the fact that apparently his mother did not consider conveyance of title or obligation to convey title to son in 1944 a *fait accompli,* for in her (unprobated) will she purported to devise "all the land *that I own* across the west side of the Highway 25" to son Don. Furthermore, while son exercised some of the acts normally incident to a claim of ownership of the land, his failure to pay taxes does not bespeak the conduct of one who claims to own land. Leaving the land, leaving father to pay debts son owed on the buildings, acquiescing in father collecting the rents and improving and managing the property, looks more like abandonment of claim to the land than the acts of a person asserting ownership. Finally, the hostility that developed between father and son and the friction evident as between plaintiff and stepmother provide a different motive for this intra-family litigation than that of simple vindication of ownership rights. The trial judge characterized this action as "just the age-old feud between children and the step-mother trying to evade the consequences of a later marriage."

◾ The circuit court properly stated the burden of proof as resting on son to establish a constructive trust by clear, cogent and convincing evidence. *Etheridge v. Hammer,* 450 S.W.2d 207, 210[1] (Mo.1970). Our review of the law and evidence leads us to the same conclusion reached by the circuit court, namely, that son's evidence did not rise to that character of proof.

◾ On the claim of breach of a confidential relationship between son and parents the record lacks the necessary supporting evidence. "A confidential relationship is not proved merely by a showing that persons are in ties of blood or family (*Beach v. Beach,* Mo., 207 S.W.2d 481[6]; *Parker v.*

*Blakeley,* 338 Mo. 1189, 93 S.W.2d 981, 991[12]; *Norton v. Norton,* [43 S.W.2d 1024 (Mo.1931)] l. c. 1032[8, 9]) \* \* \*." *Service Life Ins. Co. of Fort Worth v. Davis,* 466 S.W.2d 190, 196[5] (Mo.App.1971). " \* \* [M]ere kinship does not of itself establish a confidential relation. Often relatives \* \* deal at arms length and act independently and so are held not to have been in a confidential relation." Bogert, Trusts and Trustees, Second Ed., § 482. As stated in the *Service Life* case, a confidential relationship is synonymous with a fiduciary relationship, and extends to instances in which a special confidence is reposed on one side and there is resulting *domination and influence* on the other. Accepting everything son testified to at face value, there is no basis for a finding of a confidential or fiduciary relationship. This is the case of a son coming home from serving his country in time of war, intent on establishing himself in the poultry business, and parents, desiring to ease their son's entry into business with as little cost to him as possible and to the extent they could afford, offering him land on which to establish himself. Son knew parents had only a leasehold interest in the land and could not effectively offer him any greater interest than the *use* of the land. Son had no right on the basis of confidential or fiduciary relationship to believe that he would get legal title to the land. In any event there is nothing to suggest that parents had any undue influence over son in the conduct of his affairs, or that they dominated him. That necessary element of a finding of confidential relationship is entirely lacking. While at least in the early years the natural love and affection as between parent and child was evident, there is no evidence that in their business affairs and dealings parents and son did not at all times deal with each other at arms' length. There was no special reliance by the son upon the word, advice or judgment of parents; no surrendering by him of his independence in making business judgments; no automatic or habitual manipulation of his actions by them; no posi-

tion of superiority or domination over the son.

On the claim of unjust enrichment there is insufficient evidence to make a case. Son claims that in reliance upon parents' offer he expended his own time, labor and money erecting seven buildings at an estimated cost of $19,000 or $20,000 believing the land to be his in accordance with his parents' statement and that these facts are sufficient in equity to "impose a constructive trust upon property over which someone else has wrongfully assumed control." Son says the 1944 "agreement" in effect passed title to him to the land to the west, even though the formality of a deed was omitted; that this arrangement was modified in 1959 at which time son "told [his father] he could have the rent for the rest of [his father's] lifetime," if father paid the son's debt, thus entitling father to a life estate in the property to the west. Son's own evidence, however, indicates that considerable enrichment flowed in the other direction—to him. It demonstrates that father loaned son money on numerous occasions, and that son did not always repay the loans; that father cosigned notes at banks for son's benefit, and paid these notes when son defaulted; that father assumed and paid $1,300 son owed on the buildings when he left the property; that son contributed nothing to the purchase of the property from the Lead Company in 1951; that thereafter son paid nothing on the taxes assessed against the property; that four of the buildings were dismantled, and sold by son, who retained the proceeds; that son had the use and benefit of the land in question for 14 years, where he conducted a business and kept the profits, without payment of rent to parents. Serious doubt is cast upon son's testimony that he was not substantially indebted to parents, by sister Melba's testimony on cross-examination identifying her mother's handwriting on a paper writing found attached to mother's will, indicating mother's wish to cancel a debt Don owed parents in the sum of $10,-600. For son to make a case of unjust enrichment, in view of the financial benefits flowing from parents to son, he had to show by clear, cogent and convincing evidence that on balance he enriched parents more than he was enriched by them. This would require son to show definite and certain amounts spent for improvements, instead of the indefinite testimony he gave, consisting largely of undocumented guesses based on memory of transactions and costs incurred 20 or more years in the past; to reckon with the depreciation factor; to introduce evidence of the amount of the taxes through the years and the percentage of the tax bills attributable to the property on the west side; to show the amount of rent received by father and the reasonable rental value of the property enjoyed by son for 14 years; to show with some degree of certainty the total amount of loans made by father to son and the total amount of repayments actually made by son to father; to account in detail for other financial benefits extended son by father, and otherwise to establish son's right to claim that after all legitimate setoffs parents or father and stepmother were unjustly enriched. Son's fragmentary, incomplete and indefinite evidence in this respect is not a sufficient foundation upon which to base a finding of unjust enrichment.

■ Appellant's second point is that the court made a faulty inference and misinterpreted the testimony of Gloria Stricklin that she believed Don's land was only where the buildings were, by stating that this testimony "destroyed" any evidence of a constructive trust. Without engaging in a semantic exercise on the question whether this testimony destroyed son's case, it clearly adversely affected son's testimony as to the extent of the acreage he claimed. The court reached the right result, which is not to be set aside by the trial judge's use of the word in question, whether accurate or inaccurate.

Entertaining substantial doubts as to the existence of the facts upon which appellant depends, and being unwilling to upset a

record title of nearly 25 years' standing on the basis of this insubstantial evidence, we affirm the judgment of the circuit court finding that no constructive trust was proved.

SMITH, C. J., and STOCKARD, Special Judge, concur.