On Application for Rehearing
The opinion of March 9, 2007, is withdrawn, and the following is substituted therefor.
Gregory Allen Hopkins, Sr. ("the son"), filed a complaint in the Baldwin Circuit Court seeking to set aside a deed and to impose a constructive trust upon property he had conveyed to his father, Troy Edsel Hopkins, Sr., and his mother, Augusta P. Hopkins (sometimes collectively referred to as "the parents"), in January 1986. Thereafter, the parents filed in the Baldwin District Court an unlawful-detainer action seeking to evict the son from the premises. The district court action was eventually consolidated with the circuit court action.
Following lengthy hearings held on August 18, 2004, November 29, 2004, and March 21, 2005, the circuit court denied the relief requested by the son and entered a judgment on August 4, 2005, in favor of the parents on the son's complaint. On October 27, 2005, the parents moved to dismiss their unlawful-detainer action; the circuit court granted that motion on November 21, 2005.
The son timely appealed to the Alabama Supreme Court on December 30, 2005. The supreme court transferred the appeal to this court pursuant to § 12-2-7(6), Ala. Code 1975. On appeal, the son lists four issues; all four issues, however, are variations of his argument that the circuit court erred by finding that he had "failed to prove a confidential relationship between the parties."
The parents have been in the business of operating gasoline and automotive-service stations in Mobile County, Baldwin County, and Escambia County for more than 35 years. The son is the third of the parents' five children, all of whom have worked in the family businesses at one time or another. In the mid-1970s, when the son wanted to buy a house in Mobile, the parents loaned him $8,000 to pay the seller's equity, *Page 384 
placed title in the name of the father, a veteran, and assumed the seller's Veteran's Administration mortgage. The son testified that the parents also "set [him] up in his own business," explaining that they had allowed him and his wife to operate a service station in Mobile that his parents were leasing from Gulf Oil Company. The father testified that, during the 18 to 20 months that the son operated the station, he paid the son's gasoline supplier for 10 or 12 of those months. The mother testified:
 "[The son and his wife] did manage the station. It was in [the father's] name, all the records were in [the father's] name. [The father] paid the sales tax. [The son and his wife] had a bank account, and they couldn't make ends meet, so we supplied inventory, helped them with gas, sent our employees to help them, and did the books for them when they didn't finish them. And this went on for a while. And [the son] had an opportunity to sell the inventory and equipment, was not making a profit, and approached his father with a buyer and [the father] said okay because it was a loss situation for us. So [the son] did sell that business. And I think he netted $6,500."
When he received the $6,500, the son did not repay his parents any of the money he owed them; instead, he bought a truck and went to Canada on vacation.
In 1980, the son and his wife decided to move to Orange Beach. The son sold the Mobile residence and realized $15,000 on the sale, but he did not repay his parents any of the $8,000 that they had loaned him for the down payment. In 1980, the son and his wife purchased a parcel of real estate on Canal Road in Orange Beach for $52,000. They made a down payment of $5,200 and executed a note to a local savings and loan institution secured by a mortgage for the balance. The son and his wife moved into an existing two-bedroom residence on the property, and the son began operating a boat-motor repair business, a sole proprietorship known as Hopkins Marine Services, on the property. The evidence tended to show that the son's business flourished during the warm months (and that the son spent lavishly during those times) but that the business languished during the colder months (and that the son invariably failed to plan ahead or save for the lean times). The son became delinquent on his mortgage payments, and he failed to remit payroll and sales taxes to the federal and state taxing authorities. The parents testified that between 1980 and 1985 they loaned the son $40,000 to help him in his boat-motor repair business and "to keep him out of jail for tax evasion." The son disputed that amount, stating that the parents had loaned him less than $20,000.
By 1985, the son and his wife had paid only $5,474.13 on their mortgage indebtedness in five years. The mortgagee was preparing to foreclose, and there was a warrant for the son's arrest for tax evasion.[1] The son first offered to sell the Canal Road property to a local merchant for $70,000, but the attempt to sell was hampered by the tax hens on the property. The son testified that he "thought he had borrowed enough from his parents," so he approached them with a request that they cosign a loan with him so that he could refinance his mortgage on the Canal Road property, pay off his tax liens, and have some operating capital to put into his business. *Page 385 
The parents testified that they refused to cosign a loan for the son because they understood that they would be putting their assets at risk if the son defaulted. Instead, they proposed to the son that they buy the Canal Road property from him, that he continue to live on the property and operate his boat-motor repair business there, that they build him a larger building to conduct his business, and that he pay them rent in the amount of $600 per month.
The son testified that he thought that he and his wife would be the grantors on the deed and that all four parties — his parents, he, and his wife — would be the grantees. The son said he was surprised when, at the closing on January 3, 1986, he saw that the deed did not name his wife and him as grantees. However, he said that when he called the omission to his parents' attention, they replied, "Don't worry; we don't want your property and don't want your business," and that he then reluctantly signed the deed to his parents upon their oral promise to reconvey the property to him "when he got back on his feet," or words to that effect.
The parents testified that they purchased the Canal Road property for $125,000. Of that amount, they said, they were credited with a $40,000 down payment that represented the amounts they had loaned to the son from 1980 to 1985. After payment of the son's existing mortgage balance of $46,525, the net proceeds from the sale were slightly more than $38,000, a sum that the son and the father divided, with each receiving approximately $19,000. The father testified that, after the sale, he loaned the son "all but $6,000" of the $19,000 he had received at the closing. The son denied having received any portion of the father's $19,000. Both parents denied making any oral agreement to reconvey the property to the son.
A sales agreement, a HUD closing statement, a lease, a letter memorializing the terms of the lease and acknowledging the parents' $40,000 down payment, and a warranty deed were admitted into evidence. The sales agreement, executed on November 9, 1985 — 55 days before the closing — and signed by the son and his wife, reflected that the parents were the only grantees. The HUD closing statement reflected that the son and his wife were the sellers and that the net proceeds from the sale were $38,273.40. The son testified that he signed whatever he was asked to sign without reading the documents. The son admitted that he had notice, before the closing, of the terms of the lease.
After the sale, the parents opened an automotive-service business on the Canal Road property. The son testified that he managed the automotive-service business as well as his business (which had by then expanded into marine sales and service) under the name "Hopkins Auto Marine." The mother assisted Hopkins Auto Marine by keeping the books and helping out with whatever needed to be done. She convinced the son to put the business checking account and taxpayer-identification number in her name so that he would have no more problems with taxes. The parents did not erect the building they had agreed to build for the son, and the son did not pay any rent from 1986 to 1990.
The son testified that after his parents gained control of his business checking account, they moved funds out of the account into the accounts of their other businesses and used them to pay personal expenses. The mother and one of the parents' daughters, who had done the bookkeeping for the family businesses, testified that it had always been their practice to pay personal and business expenses out of whatever account was handy and to transfer funds back and forth between the *Page 386 
various family businesses. That practice continued for the business located on the Canal Road property. The mother and the daughter explained that when a family member's personal expenses were paid, the amount was deducted from the family member's paycheck or was otherwise reconciled. Likewise, they said, when funds were shifted from one family business to another, a notation was made and the funds were later replaced or were otherwise properly accounted for. The son disputed the explanation provided by his mother and sister, insisting that moneys from his business accounts were depleted without later being restored or reconciled. For that reason, the son testified, he changed the name of the business back to "Hopkins Marine Services" and opened an account with his own taxpayer-identification number in 1991. At the end of 1990, the son had tax hens in the amount of $37,000.[2]
The son testified that in 1993 he asked his parents to put the Canal Road property "back in his name." That request resulted in a family argument, after which the son left the Canal Road business and moved to Sportsman's Marina, where he leased space to conduct his marine business. The parents testified that when the son left he took with him all of his marine equipment and inventory (much of which, the parents said, they had paid for), plus a good deal of the parents' automotive equipment and tools, for which the parents were never reimbursed. The son denied taking anything other than his marine equipment and tools.
In 1999, after he was asked to leave Sportsman's Marina for failure to pay his rent, the son asked his father, who was recuperating after a heart attack, if he could come back and rent space at the Canal Road property for his business, which then involved storing and showing, as well as repairing, boats. The father agreed to give the son three months' free rent, after which he would pay rent of either $2,500 per month for the marine business only or $3,500 per month for both the marine and automotive businesses. The son paid one months' rent and then proposed a 20-year amortization plan with monthly payments of $3,384 that would, he said, pay all his debts to his parents and enable him to get the Canal Road property back. The father accepted that plan; the son made sporadic payments.
The mother testified that sometime in the late 1990s she and her husband decided to list the Canal Road property for sale, giving the son a right of first refusal on any sale. The son proposed that he purchase the property with no down payment and give the parents a second mortgage. The parents responded that they would finance a sale with a down payment if the son would pay his debts and "show some responsibility." The mother had a "serious conversation" with the son, confronting him with the fact that he had debts of over $150,000 and encouraging him to learn to budget. The mother testified that the son admitted to her that he had lost approximately $40,000 by gambling. In addition, he acknowledged that he and two business partners had bought a parcel of property in Orange Beach, had lost the property, and had lost "over $100,000" as well.
In 2002, the son asked his father to loan him $350,000 so that he could pay all his debts and not have any more floor-plan financing charges. The father went to the son's banker to inquire what debts were included in the $350,000 figure and learned *Page 387 
that the son owed alimony, legal fees for two lawyers, a truck note, his children's car notes, and past-due rent. When the parents summarily refused to loan the son any money, the son told his mother, "I'm going to sue your damn ass." After having a similarly unpleasant confrontation with his father, the son warned the mother, "If you let your husband come up here again I'll kill the son of a bitch."
In 2003, the parents listed the Canal Road property with a realtor for $750,000. In March 2003, the son sued the parents, seeking to set aside the 1986 deed and to impose a constructive trust on the Canal Road property.
 Standard of Review
"The issue of whether or not a constructive trust results is one of fact." Brothers v. Moore, 349 So.2d 1107, 1108
(Ala. 1977); Davis v. Barnfield, 833 So.2d 58, 64
(Ala.Civ.App. 2002).
 "`A constructive trust is a creature of equity which operates to prevent unjust enrichment. When a trial judge [is asked to] exercise his equitable discretion and [to] impose a constructive trust, we will not disturb his decision unless it is clearly erroneous.'"
Davis v. Barnfield, 833 So.2d at 64 (quotingHolman v. Kruk, 485 So.2d 715, 716 (Ala. 1986)).
 Discussion
The Alabama Supreme Court has defined a constructive trust as follows:
 "`[A] constructive trust will be found when property has been either acquired by fraud, or where in the absence of fraud it would not be equitable to allow it to be retained by him who holds it.' Brothers v. Moore, 349 So.2d 1107, 1108 (Ala. 1977). In essence, a constructive trust is imposed to prevent unjust enrichment. Id."
Brothers v. Fuller, 607 So.2d 135, 137 (Ala. 1992).
 "`Equity may also impress a constructive trust on property in favor of one beneficially entitled thereto against a person, who, against the rules of equity and against good conscience, in any way either has obtained or holds and enjoys legal title to property that in justice that person ought not to hold and enjoy.'"
Brown v. Brown, 604 So.2d 365, 370 (Ala. 1992) (quoting American Family Care, Inc. v. Irwin,571 So.2d 1053, 1058 (Ala. 1990)) (emphasis omitted).
A constructive trust may be impressed upon property when the grantee of the property has abused a confidential relationship with the grantor. Cole v. Adkins, 358 So.2d 447, 450
(Ala. 1978).
 "A constructive trust is properly impressed upon property under certain limited circumstances even though the Statute of Frauds makes an oral agreement to convey land unenforceable. In Restatement of the Law of Restitution, § 182 (1937 ed.), the principle is stated as follows:
 "`Where the owner of an interest in land transfers it inter vivos to another upon an oral trust in favor of the transferor or upon an oral agreement to reconvey the land to the transferor, and the trust or agreement is unenforceable because of the Statute of Frauds, and the transferee refused to perform the trust or agreement, he holds the interest upon a constructive trust for the transferor, if [Emphasis Added]
 "`. . . .
 "`(b) the transferee at the time of the transfer was in a confidential relation to the transferor [and the transferee abused the confidential relationship] . . .
 "`. . . *Page 388 
 "`Comment on Clause (b):
 "`c. Where transferee is in a confidential relation to transferor. Where the owner of an interest in land transfers it to another who orally agrees to hold it in trust for the transferor or to reconvey it to the transferor, and the transferee at the time of the transfer was in a confidential relation to the transferor, the transferee will not be permitted to keep the land but will be compelled to hold it upon a constructive trust for the transferor, since otherwise he would be unjustly enriched. A constructive trust will be imposed even though at the time of the transfer the transferee intended to perform the agreement, and even though he was not guilty of undue influence or other abuse of his confidential relation to the transferor in procuring the transfer. . . .
 "`. . . .
 "`A confidential relation exists not only where there is a fiduciary relation such as that between attorney and client, trustee and beneficiary, guardian and ward, partner and partner, and the like, but also where, because of family relationship or otherwise, the transferor is in fact accustomed to be guided by the judgment or advice of the transferee or is justified in placing confidence in the belief that the transferee will act in the interest of the transferor. [Emphasis Added] . . .'"
Cole v. Adkins, 358 So.2d at 448-49 (some emphasis omitted).
The circuit court's judgment states:
 "This cause came before this Court on a complaint by the [son] petitioning the Court to set aside a deed of conveyance and to impose a constructive trust in favor of [the son] on the real property, which was the subject of the conveyance, and the Court having heard the testimony ore tenus and having considered the evidence, the pleadings and the arguments of the attorneys, hereby finds and decrees as follows:
 "1) That [the son] has failed to prove a confidential relationship between the parties; and
 "2) That [the son] has failed to show that the Court in equity should impose a constructive trust in his favor on the real property in issue.
 "Accordingly, the Court hereby finds judgment in favor of [the parents] and against [the son] as to each and every issue."
The son's argument is in two parts. First, he maintains that the circuit court erroneously imposed upon him a burden of proving that he and his parents had a confidential relationship when, he says, Alabama law requires the fact-finder topresume the existence of a confidential relationship between a parent and a child. Second, he argues that the circuit court's initial error of failing to apply the presumption of a confidential relationship led the court into a further error — misallocating the burden of proof to him when, he says, the court should have shifted the burden of proof to his parents to establish that the son was the dominant party in the relationship or to establish, by clear and convincing evidence, that the transaction was fair and free of undue influence. Our resolution of the first part of the son's argument makes discussion of the second part unnecessary.
The son cites a number of Alabama authorities for the proposition that the parent-child relationship is presumptively a confidential one. See, e.g., Wilson v. *Page 389 Wehunt, 631 So.2d 991, 993 (Ala. 1994) (stating that the parent-child relationship is "`per se a confidential one' "); Chandler v. Chandler, 514 So.2d 1307, 1308 (Ala. 1987)(same); Nelson v. Buckley, 567 So.2d 855, 856
(Ala. 1990) (stating that "[t]he relationship of parent and child is inherently a confidential one"); and Brothers v.Moore, 349 So.2d 1107, 1109 (Ala. 1977) (stating that the parent-child relationship is "considered confidential"). Whether the parent-child relationship is described in our caselaw as "per se a confidential one" or "inherently confidential," it is clear that the presumption regarding the existence of the relationship is a rebuttable one. As Professor Hoffman has observed, "irrebuttable" or "conclusive" presumptions are, in reality, "rules of substantive law masquerading as rules of proof." Jerome A. Hoffman,Thinking About Presumptions: The "Presumption" of Agencyfrom Ownership as Study Specimen, 48 Ala. L.Rev. 885, 896 (1997). Rule 301, Ala. R. Evid., entitled "Presumptions in General in Civil Actions and Proceedings," provides, in pertinent part:
 "(a) Conclusive and Rebuttable Presumptions. Except for presumptions that are conclusive under the law from which they arise, a presumption is rebuttable.
 "(b) Types of Rebuttable Presumptions. Every rebuttable presumption is either:
 "(1) A presumption that affects the burden of producing evidence by requiring the trier of fact to assume the existence of the presumed fact, unless evidence sufficient to sustain a finding of the nonexistence of the presumed fact is introduced, in which event the existence or nonexistence of the presumed fact shall be determined from the evidence without regard to the presumption; or
 "(2) A presumption affecting the burden of proof by imposing upon the party against whom it operates the burden of proving the nonexistence of the presumed fact.
 "(c) Procedural Impact. Unless otherwise provided by statute, a presumption established primarily to facilitate the determination of the particular action in which the presumption is applied, rather than to implement public policy, is a presumption affecting the burden of producing evidence."
If the existence of a parent-child confidential relationship is a presumption affecting the burden of production, then Rule 301(b)(1) requires the trier of fact "to assume the existence of the [confidential relationship], unless evidence sufficient to sustain a finding of the nonexistence of the [confidential relationship] is introduced, in which event the existence or nonexistence of the [confidential relationship] shall be determined from the evidence without regard to the presumption." We conclude that, in the present case, the parents presented evidence sufficient to sustain a finding of the nonexistence of a confidential relationship between the son and the parents and that the circuit court could decide the issue, without regard to the presumption, as it would any other question of fact.
On the other hand, if the existence of a parent-child confidential relationship is a presumption affecting the burden of proof, then Rule 301(b)(2) imposed upon the parents the burden of disproving the existence of a confidential relationship between the son and the parents. We conclude that they did so.
In Bressler v. Dudley, 694 So.2d 1355
(Ala.Civ.App. 1996), the existence of a parent-child confidential relationship was at issue. There, a mother sued her daughter and son-in-law, alleging that they had slandered her title to property by recording a *Page 390 
vendor's lien against the property. The daughter and son-in-law moved for a summary judgment, asserting that the mother's claim was barred by the applicable statute of limitations. The trial court agreed and entered a summary judgment in favor of the daughter and son-in-law. On appeal, the mother argued that the mother-daughter relationship was a confidential one; that the daughter and her husband "were guilty of fraudulent concealment when they failed to reveal to [the mother] that they had recorded a lien against her property," 694 So.2d at 1358; and that the statute of limitations should have been tolled until the mother actually discovered that the lien had been filed.
This court rejected the mother's argument that the mother and daughter had a confidential relationship. Noting that the daughter and her husband "had appropriated [over $50,000] to themselves from [the mother's] bank account, without [the mother's] consent or permission," 694 So.2d at 1358, the court held that
 "it could not be said that there existed such a `confidential relationship' between the parties that [the daughter and son-in-law] occupied a role which inspired confidence that they were acting in good faith for [the mother's] interest."
Id. Compare Jordan v. Mitchell 705 So.2d 453, 461
(Ala.Civ.App. 1997) (holding that no confidential relationship existed between unmarried cohabitants because the female cohabitant neither relied upon any promise nor depended upon any financial expertise of the male cohabitant).
In Cannon v. Gilmer, 135 Ala. 302, 304-05, 33 So. 659,659 (1903), the Alabama Supreme Court explained that confidential relationships
 "apply . . . to all cases in which confidence is reposed by one party in another, and the trust or confidence is accepted under circumstances which show that it was founded on intimate personal and business relations existing between the parties, which gave the one advantage or superiority over the other. . . ."
(Emphasis added.) See also Kyle v. Perdue,95 Ala. 579, 585, 10 So. 103, 105 (1891) (stating that, in a confidential relationship, "confidence is justifiably
reposed" by one party in the other party (emphasis added)).
In the present case, the son argues that he and his parents had a history of dealings in which title to property was held by the parents for his benefit. He points out that, although his parents were the record titleholders of his first residence in Mobile, they allowed him to keep the proceeds of the sale of that residence and never asked him to return their $8,000 down payment. Similarly, he says, his parents did not question his retaining the $6,500 proceeds from the sale of a service-station lease when the parents were the lessees. Thus, the son claims, the dealings between the parties leading up to the 1986 conveyance of the Canal Road property indicate two things, namely: (1) that the parents held a position of financial dominance over him and that he occupied a financially subordinate, if not completely dependent, position with respect to the parents; and (2) that he was justified in trusting his parents' promise to hold the Canal Road property for him and not to keep it for themselves.
In the absence of definitive Alabama authority explaining how to analyze whether the trust asserted by the son supports the existence of a parent-child confidential relationship, we have turned to legal commentators and decisions from other jurisdictions.
In The Wolf at the Campfire: Understanding ConfidentialRelationships, 53 S.M.U. L.Rev. 315, 330 (2000), Professor *Page 391 
Roy Ryden Anderson explains the "trust or confidence" element that must be present in a confidential relationship:
 "Easily the most common reason given by courts for a refusal to find a confidential relationship is that `mere subjective trust' of the asserting party is insufficient to establish the relationship. This limitation embodies three important connotations. First, and most obvious, the trust alleged by the party asserting the relationship must be both believable and verifiable from the objective facts. The question is one for the trier of fact. If the trier does not believe that the party alleging the confidential relationship placed trust in the alleged fiduciary, the allegation will fail. Further, a basis for that trust must be shown by objective evidence. The mere subjective assertion by the claimant is insufficient.
 "The second connotation of the `mere subjective trust' limitation goes to the level of trust reposed by the claimant. The claimant must show not just that he trusted the other party, but that he trusted him to act as a fiduciary. Further, reposing that level of trust must have been reasonable under the circumstances. It is the lack of this reasonableness that has caused so many courts to refuse to find in favor of a confidential relationship. . . .
 ". . . .
 "There is yet a third connotation implicit in the `mere subjective trust' limitation. It is essential that the person to be charged with a fiduciary obligation arising from a confidential relationship be aware that the other party has that expectation. There is little focus in the case law on this point, no doubt because the requirement that the claimant demonstrate by objective evidence that his expectation of the alleged fiduciary was reasonable carries with it the implicit assumption that the party to be charged has reason to know of the expectation."
53 S.M.U. L.Rev. at 327-29 (footnote omitted).
In the present case, the circuit court was authorized to find that the son's assertion that he trusted his parents to hold the property for him indefinitely and without regard to whether he "got back on his feet" or was progressing toward financial responsibility was "mere subjective trust," insufficient to establish a relationship of confidentiality. See
Anderson, 53 S.M.U. L.Rev. at 327. "[T]he trust alleged by the party asserting the relationship must be both believable and verifiable from the objective facts. The question is one for the trier of fact." Id. The record contains evidence from which the circuit court could have found that the trust or confidence asserted by the son was neither "believable" nor "verifiable from objective facts."
The son testified that, in 1985, when he found himself in debt, unable to make his mortgage payments, and beset with tax liens, he did not ask his parents to lend him money because he "thought he had borrowed enough from [them]." Instead, he approached his parents with a request that they cosign a loan with him to refinance his mortgage. From that testimony, the circuit court could have found that the son was aware that he had imposed upon his parents' generosity too often and that it was, therefore, unbelievable that the son had reposed the kind of trust in his parents' continuing largesse that he asserted.
There was evidence from which the circuit court could also have found that the son's asserted trust in the parents was not "verifiable from the objective facts." Anderson, 53 S.M.U. L.Rev. at 327. The evidence supports findings that the parents were lenient in dealing with the son's *Page 392 
lack of prudence and thrift before 1986; that they generously gave the son several opportunities to establish himself in business; and that, by the time they agreed to purchase the Canal Road property in 1986, they had determined to do more to help the son in the hope that he would eventually redeem himself but that, in the mean-time, they determined to protect their interests against the eventuality of the son's default. Thus, the parents structured the 1986 conveyance as an arm's-length transfer, naming themselves as sole grantees, crediting themselves with $40,000 in prior loans to the son, and requiring that the son make rental payments reflecting his use of the premises for his business. Because the documents evidencing the transaction were typical of those representing an agreement reached after arm's-length bar-gaining, the circuit court could have disbelieved the son's testimony that he was "surprised" that his name did not appear as a grantee on the deed but that he decided, nevertheless, to sign the deed upon his parents' oral promise to reconvey the property to him.
John Daniels, the family's long-time realtor, testified that he explained and discussed the significance of all the closing documents with the son before the son signed them. Although the son gave his opinion that Daniels had "conspired" with his parents to take his property away from him and stated that he would not trust Daniels "as far as he could throw him," the circuit court was entitled to discredit that testimony in light of the facts that Daniels had helped the son find, finance, and later sell his first home in Mobile and that the son had consulted Daniels about other real-estate matters.
Considering all the circumstances leading up to and accompanying the Canal Road property transaction, the circuit court could well have found the son's testimony that he was blindsided by the outcome of that transaction to be incredible. In a case with similar facts, the Supreme Court of Texas held that "mere subjective trust alone is not enough to transform arms-length dealing into a fiduciary relationship so as to avoid the statute of frauds." Thigpen v. Locke,363 S.W.2d 247, 253 (Tex. 1962).
In Gibson v. Gibson, 534 S.W.2d 100 (Mo.Ct.App. 1976), the parents were poultry farmers who leased a 14-acre tract bisected by a highway. Their son returned from military duty in 1944 and announced that he planned to buy a farm and go into the poultry business. The parents told the son that if he would locate on that part of their leased property that was west of the highway ("the west tract"), the land would be "his."534 S.W.2d at 101. The son established his home and business on the west tract. The parents loaned him money, advanced chicken feed to him on credit, paid the feed bill, co-signed a note at the bank for him, and eventually paid off the balance due on the note. The son made improvements to the land, including constructing buildings and roads, and connecting to electricity and water lines. In 1951, the parents purchased the entire 14-acre tract from their lessor. The mother subsequently died and the father remarried. In 1959, economic losses forced the son to abandon the poultry business. The son moved away, leaving his father to pay the debts owed on the improvements. The father and stepmother conveyed to a third party that part of the west tract on which the son had installed improvements. The son returned for visits in 1963 and 1969, during which his encounters with the father and stepmother were extremely acrimonious. Over 20 years after the 1944 agreement, the son filed an action to establish a constructive trust on the west tract.
The trial court in Gibson entered a judgment finding that there had been no confidential *Page 393 
relationship between the son and his parents; the Missouri Court of Appeals affirmed that judgment. Because many of the court's observations with respect to the parties' dealings are pertinent to the facts of the present case, we quote at length from the court's holding:
 "`Often relatives . . . deal at arms length and act independently and so are held not to have been in a confidential relation.' Bogert, Trusts and Trustees, Second Ed., § 482. . . . [A] confidential relationship is synonymous with a fiduciary relationship, and extends to instances in which a special confidence is reposed on one side and there is resulting domination and influence on the other. Accepting everything son testified to at face value, there is no basis for a finding of a confidential or fiduciary relationship. This is the case of a son coming home from serving his country in time of war, intent on establishing himself in the poultry business, and parents, desiring to ease their son's entry into business with as little cost to him as possible and to the extent they could afford, offering him land on which to establish himself. Son knew parents had only a leasehold interest in the land and could not effectively offer him any greater interest than the use of the land. Son had no right on the basis of confidential or fiduciary relationship to believe that he would get legal title to the land. In any event there is nothing to suggest that parents had any undue influence over son in the conduct of his affairs, or that they dominated him. That necessary element of a finding of confidential relationship is entirely lacking. While at least in the early years the natural love and affection as between parent and child was evident, there is no evidence that in their business affairs and dealings parents and son did not at all times deal with each other at arms' length. There was no special reliance by the son upon the word, advice or judgment of parents; no surrendering by him of his independence in making business judgments; no automatic or habitual manipulation of his actions by them; no position of superiority or domination over the son."
534 S.W.2d at 104-05 (emphasis added).
In the present case, there was no evidence indicating that the son had sought his parents' advice (or that he had even consulted his parents) before he decided to purchase the Canal Road property in 1980. There was also no evidence indicating that he had sought his parents' advice before purchasing, with two business partners, a separate parcel in Orange Beach that, he said, he had ultimately "lost," along with "over $100,000." The circuit court, therefore, could have found that any "special reliance" by the son upon his parents was limited to a reliance upon their ability to bail him out of debt, rather than a reliance "upon [their] word, advice or judgment." See Gibson v. Gibson, 534 S.W.2d at 105. The evidence supports a finding that the son made a number of bad business judgments, about which the parents learned onlyafter the fact, as contrasted to what the Missouri court noted, in Gibson, was the norm in a parent-child confidential relationship: a willing "surrender by [the child] of his independence in making business judgments" in deference to his parents' "word, advice or judgment." Seeid.
The result in this case is the same, irrespective of whether the confidentiality of a parent-child relationship is a rebuttable presumption affecting the burden of production under Rule 301(b)(1), Ala. R. Evid., or a rebuttable presumption affecting the burden of proof under Rule 301(b)(2), Ala. R. Evid. Subsection (b)(1) required the circuit court, as the trier of fact, to assume the existence of a confidential relationship between the parties only *Page 394 
until evidence sufficient to sustain a finding of thenonexistence of the confidential relationship was introduced, at which time the court was permitted to determine the existence or nonexistence of the confidential relationship without regard to the presumption — that is, as it would determine any other question of fact. See Beinlich v.Campbell, 567 So.2d 852 (Ala. 1990). On the other hand, subsection (b)(2) required the parents to prove the nonexistence of a confidential relationship.
Because the record contains overwhelming evidence of the nonexistence of a confidential relationship between the son and the parents, and because the son posited no other basis for imposing a constructive trust, such as fraud or the prevention of unjust enrichment, see Brothers v. Fuller,607 So.2d at 137, the circuit court's judgment refusing to impose a constructive trust upon the Canal Road property is due to be affirmed.
OPINION OF MARCH 9, 2007, WITHDRAWN; OPINION SUBSTITUTED; APPLICATION OVERRULED; AFFIRMED.
THOMPSON, P.J., and PITTMAN, BRYAN, and MOORE, JJ., concur.
[1] The mother testified that, based on her personal friendship with the State finance director and her political connections with the Baldwin County district attorney, she managed to have the tax-evasion prosecution dropped. She also paid the tax liens.
[2] The parents paid the liens — along with interest and penalties totaling $97,000 — in 1997, using the proceeds of a settlement of their lawsuit against BP Exploration Oil, Inc. See BP Exploration Oil,Inc. v. Hopkins, 678 So.2d 1052 (Ala. 1996).